UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

RAGHAVAN SATHIANATHAN,                          :

     Plaintiff,              :

    -against-                       :

SMITH BARNEY, INC., MORGAN              :
STANLEY, INC., BRESSLER, AMERY &
ROSS LAW FIRM, EDWARD TURAN,        :
JEFFREY FRIEDMAN, THOMAS
MIERSWA, BRIAN AMERY,                        :
HUGO HILGENDORFF IV, GEORGE
SULLIVAN, DAVID RESTAINO, JAMES    :
YELLEN, STEPHEN DIMODICA,
MORGAN STANLEY EMPLOYEE 'A,'        :
SAMUEL "SKIP" KEESAL, ROBERT
ERICSON AND MICHELE FRON,              :

     Defendants.           :

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
DEBORAH A. BATTS**

04 Civ. 7122 (DAB)(FM)

---------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.  Introduction

    In this action, pro se plaintiff Raghavan Sathianathan ("Sathianathan")

alleges that his former employers, Smith Barney, Inc. ("Smith Barney") and Morgan

Stanley, Inc. ("Morgan Stanley"), conspired with two outside law firms, Keesal, Young &

Logan ("KYL"), and Bressler, Amery & Ross ("the Bressler firm"), and others, to deprive

him of his rights on the basis of his race, in violation of 42 U.S.C. §§ 1981, 1985, and

1986, and to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

18 U.S.C. §§ 1961, et seq. Sathianathan also has brought state law claims alleging legal malpractice, failure to supervise, and breach of the implied covenant of good faith and fair dealing.

The case arises out of Sathianathan's employment as a stockbroker at Smith Barney, where he handled two customer accounts that sustained significant losses. After Sathianathan left Smith Barney and joined Morgan Stanley, to which the customers eventually transferred their accounts, one of the customers filed a claim with the Pacific Stock Exchange ("Pacific Exchange") and sought arbitration. The two brokerage houses agreed to share the costs of retaining counsel to defend against that claim on behalf of Sathianathan. Eventually, both firms settled with the claimant. Sathianathan, however, declined to settle and brought his own cross-claim against Smith Barney which was dismissed. In a separate enforcement proceeding, the National Association of Securities Dealers ("NASD") concluded that Sathianathan's actions with respect to the two customer accounts were improper and barred him from further work in the securities industry.

Sathianathan alleges that if he had been assigned independent counsel, rather than a law firm beholden to his former employers, he would have been able to settle the customer complaints and avoid debarment by entering into a pact to lay the blame for the losses on Smith Barney, where it belonged. In a leviathan first amended complaint ("FAC") consisting of more than 1650 paragraphs spread over nearly 560

pages, Sathianathan lays out his theory that he was frustrated in his ability to do so by a cabal consisting of his former employers and their law firms.[1]

The FAC, which names sixteen defendants ("Defendants"), is but the tip of the iceberg. To date, Sathianathan has filed at least eight actions or proceedings addressing matters occurring during the course of his employment as a stockbroker and subsequent debarment. Some sense of the zeal with which he has pursued these suits can be garnered from the docket in this action alone, in which nearly one hundred items have been docketed in connection with the parties' pre-answer motion practice.

At present, six motions are pending before the Court. By orders dated January 27 and March 18, 2005, Your Honor referred these motions to me for a report and recommendation. (See Docket Nos. 30, 52). After reviewing the record at considerable length, I recommend that the Defendants' motions to dismiss be granted, that Sathianathan's motion to amend the FAC be denied, that the Defendants' motions for vexatious litigant determination be granted in part, that Sathianathan's motion to add parties be denied, and that the Defendants' motion to strike the FAC be denied as moot.

II.    Facts

The following factual recitation, unless otherwise noted, is based on the allegations of the FAC, the documents annexed thereto, and the documents and proceedings referenced therein.

---

[1]    The FAC contains nine sets of exhibits which, in turn, are subdivided into other exhibits.

A.    <u>Parties</u>

Sathianathan is a New Jersey resident who began working at Smith Barney in August 1998.  (<u>See</u> FAC ¶ A).  Sathianathan worked at Smith Barney until February 16, 2001, when he voluntarily resigned to join Morgan Stanley as a First Vice President.  (<u>Id.</u> & ¶ 213).

Defendant Citigroup Global Markets, Inc. [f/k/a Salomon Smith Barney, Inc., d/b/a "Smith Barney"] is a Delaware corporation headquartered in New York.  (<u>Id.</u> ¶ B(1)).  Smith Barney is a trademark of Citigroup Global Markets, Inc., which is a subsidiary of Citigroup.  (<u>Id.</u>).

Defendant Edward Turan ("Turan") is Deputy General Counsel of the Smith Barney Legal Department in New York.  (<u>Id.</u> ¶ B(2)).  Defendant Jeffrey Friedman ("Friedman") is Associate General Counsel of the Smith Barney Legal Department and reports to Turan.  (<u>Id.</u> ¶ B(3)).  Defendant Thomas Mierswa ("Mierswa") is a lawyer in the Private Client Group of the Smith Barney Legal Department.  (<u>Id.</u> ¶ B(4)).  (Smith Barney, Turan, Friedman, and Mierswa are hereinafter referred to collectively as the "Smith Barney Defendants.")

The Bressler firm is a New Jersey law firm of approximately forty-five lawyers with offices in New York City.  (<u>Id.</u> ¶ B(5)).  Defendant Brian Amery ("Amery"), a partner in the Bressler firm who works in both its New York and New Jersey offices, handles all of Merrill Lynch's customer arbitrations involving research issues in his capacity as Merrill Lynch's National Trial Counsel.  (<u>Id.</u> ¶ B(6)).   Amery is also an

arbitrator for the NASD.  (Id.).  Defendant Hugo Hilgendorff IV is a lawyer at the

Bressler firm.  (Id. ¶ B(7)).  (Amery, Hilgendorff, and the Bressler firm are hereinafter

referred to collectively as the "Bressler Defendants.")

Defendant Morgan Stanley is an investment firm incorporated in Delaware

and headquartered in New York.  (Id. ¶ B(8)).  Defendants George Sullivan ("Sullivan")

and David Restaino ("Restaino") are the co-heads of the Morgan Stanley Litigation Unit

located in New York and, as such, are responsible for the defense of proceedings against

Morgan Stanley nationwide.  (Id. ¶¶ B(9), B(10)).  Defendant James Yellen ("Yellen") is

a lawyer in the Morgan Stanley Litigation Unit.  (Id. ¶ B(11)).

Defendant Stephen DiModica ("DiModica") was the branch manager of the

Morgan Stanley branch office at the World Trade Center until "9/11," after which he and

his staff relocated to other Morgan Stanley offices.  (Id. ¶ B(12)).  After a long career at

Morgan Stanley, DiModica joined Smith Barney as a branch manager in 2003.  (Id.).

Defendant Morgan Stanley Employee A is the Morgan Stanley employee who prepared a

Form U-4 amendment regarding Sathianathan which was filed with the NASD on

December 14, 2001.  (Id. ¶ B(13)).  (Morgan Stanley, Sullivan, Restaino, Yellen,

DiModica, and Morgan Stanley Employee A are hereinafter referred to collectively as the

"Morgan Stanley Defendants.")

Defendant Keesal, Young & Logan ("KYL") is a California law firm of

approximately sixty lawyers, with a lengthy history of representing Wall Street

investment firms, such as Smith Barney and Prudential Securities.  (Id. ¶¶ B(14), B(15)).

Defendant Samuel Keesal, a/k/a "Skip Keesal" ("Keesal"), is a founding partner of KYL. (Id. ¶ B(15)). Defendant Robert Ericson ("Ericson") was a partner at KYL until 2003, when he moved to the Los Angeles office of Bingham McCutchen. (Id. ¶ B(16)). Defendant Michele Fron is a KYL partner. (Id. ¶ B(17)). (KYL, Keesal, Ericson, and Fron are hereinafter referred to collectively as the "KYL Defendants;" the Smith Barney Defendants, KYL Defendants, and DiModica are hereinafter referred to collectively as the "Moving Defendants.")

B. <u>Venkatramani Claim</u>

While Sathianathan was at Smith Barney, he became licensed by the NASD as a stockbroker in January 1999. (<u>See</u> <u>id.</u> at 212 & ¶ A). From May 2000 until he left Smith Barney, Sathianathan was the stockbroker assigned to the account of Anjan Venkatramani ("Venkatramani"). (<u>See</u> <u>id.</u> ¶¶ 211-13). When Sathianathan left Smith Barney to work for Morgan Stanley, his former manager retaliated against him for changing firms by causing Smith Barney to take one hundred days to effect the transfer of Venkatramani's account there. This was ten times longer than the ten days permitted by the applicable regulations. (<u>See</u> <u>id.</u> ¶¶ 213-14). Because Smith Barney failed to follow up with Venkatramani throughout the extended period during which the transfer was being effected, Venkatramani's account lost eighty percent of its value. (<u>See</u> <u>id.</u> ¶ 214). This, "in effect," caused Venkatramani to file a customer complaint against Sathianathan. (<u>Id.</u>).

In October 2001, Venkatramani sent a complaint letter about Sathianathan to both Morgan Stanley and Smith Barney.  (See id. ¶ 234).  After receiving this complaint, Smith Barney sent the NASD a U-5 "Uniform Termination Notice" ("U-5 Form") which quoted some of the text of Venkatramani's letter.  (See id. ¶¶ 311, 313, 315 & Ex. Set Five, Large Tab 3, Small Tab 4).  Subsequently, in February 2002, Venkatramani filed a formal statement of claim (the "Venkatramani Claim") with the Pacific Exchange against Smith Barney, Sathianathan, Morgan Stanley, and Sathianathan's former Smith Barney branch manager, Steven Torrico ("Torrico"), pursuant to which he sought to recover $10 million for the alleged mismanagement of his account.  (See id. ¶¶ 71, 170).

Yellen, who is one of Morgan Stanley's in-house attorneys, initially represented both Morgan Stanley and Sathianathan in connection with the Venkatramani Claim.  (Id. ¶ 271).  At first, Sathianathan was comfortable with Yellen and cooperated with him in this endeavor.  (Id. ¶¶ 236-37, 273-74, 288-89 & Ex. Set Seven, Tab 5).  On the other hand, Sathianathan was unwilling to cooperate with "his enemy," Smith Barney.  Indeed, he offered to assist Venkatramani in the prosecution of his claim against Smith Barney.  (Id. ¶¶ 238, 293).

Although Sathianathan was satisfied with Yellen's services, he was instructed to attend a meeting on December 13, 2001, to meet Amery, who had been hired by Smith Barney and Morgan Stanley to represent Sathianathan in the Pacific Exchange arbitration.  (Id. ¶¶ 333-36).  The persons present at that meeting included Restaino,

Yellen, Friedman, Amery, and Sathianathan.  (Id. ¶ 337).  Sathianathan attended

reluctantly, and the meeting broke up within five minutes after it had started, once

Sathianathan indicated that he was unwilling to cooperate with Smith Barney.  (Id. ¶ 339).

Thereafter, Amery met privately with Sathianathan.  (Id. ¶¶ 345-47).  Sathianathan

contends that this meeting occurred, despite his professed unwillingness to cooperate with

Smith Barney, because Smith Barney, Morgan Stanley, Amery, and others wanted Amery

to debrief Sathianathan, after which he was to be fired by Morgan Stanley and left

without the funds needed to retain his own counsel.  (Id. ¶ 344).

   During the private meeting that Amery had with Sathianathan in furtherance

of this plot, Amery told Sathianathan that he could not represent him in a suit against

Smith Barney to recover any commissions that Sathianathan allegedly was owed.  (Id.

¶¶ 341, 347).  Nevertheless, Sathianathan believed that his discussions with Amery were

subject to the attorney client privilege.  (Id. ¶ 356).  In or around April 2002, however,

Sathianathan learned that Amery had been communicating with Smith Barney.  Believing

that he was being "raped" of his confidential agreement with his lawyer, (see id. ¶ 108),

Sathianathan rejected Amery's representation and filed his own answer in the Pacific

Exchange arbitration.  (See id. ¶¶ 173, 672 & Ex. Set Three, Tab O (email to Amery,

dated Sept. 7, 2002) ("I am shocked, aghast and shattered at your flagrant and egregious

breach of my attorney client privilege with you regarding this arbitration")).

Subsequently, on April 23, 2002, Amery withdrew from any further representation of

Sathianathan.  (Id. ¶¶ 80, 1540 & Ex. Set Four, Tab 3).

Notwithstanding these developments, Sathianathan continued to cooperate with Morgan Stanley to defend against the Venkatramani claim. (Id. ¶¶ 236-37). On July 29, 2002, however, when Morgan Stanley submitted an affidavit to the arbitration panel explaining that it believed it had a joint defense privilege with Smith Barney, Sathianathan sent a letter to Restaino and Sullivan of Morgan Stanley pointing out the firm's potential liability to Venkatramani. (Id. ¶ 507). Sathianathan also sent copies of this letter to all of the parties to the Pacific Exchange arbitration, including Venkatramani. (Id.).

Ultimately, Morgan Stanley settled with Venkatramani by paying him $750,000 in return for a release of Morgan Stanley and Sathianathan for the period of time Sathianathan worked there. (Id. ¶¶ 178, 499, 511). Sathianathan did not contribute to this settlement. (See id. ¶ 188).

In or around February 2002, Morgan Stanley fired Sathianathan. The ostensible reasons for his termination were that he had placed an order for a customer who refused to pay and had not followed instructions regarding the procedures required for large trades. (See id. ¶¶ 934, 936-37). Sathianathan contends that these reasons were pretextual. (Id.).

On October 31, 2002, Venkatramani amended his claim against Smith Barney in the Pacific Exchange arbitration to raise the damages sought to over $22 million. (See id. ¶ 180). Although the arbitration was scheduled to commence in early January 2003, Smith Barney reached a settlement with Venkatramani in or around late

December 2002.  (Id. ¶ 184).  Pursuant to the settlement agreement, Smith Barney paid Venkatramani $5 million in exchange for his release of Smith Barney from any further liability for the period of time Sathianathan worked for that firm.  (Id. ¶¶ 184-88, 499 & Ex. Set Four, Tab 11).  Although Smith Barney had arranged for a release for Sathianathan, who was not being asked to contribute to the settlement, Sathianathan refused to provide a mutual general release to Venkatramani.  (See id. ¶¶ 185-88, 547-52 & Ex. Set Five, Large Tab 3, Small Tab 8, Item 28).

C.    Sathianathan Claim

Following the settlement of Venkatramani's claims against Smith Barney, Sathianathan filed a cross-claim in the arbitration proceeding against Smith Barney, Torrico, Morgan Stanley, and Venkatramani (the "Sathianathan claim"), in which he sought $30 million in damages and $450 million in punitive damages.  (Id. ¶ 188; see also Moving Defs.' Req. for Judicial Notice, dated Jan. 24, 2005 ("RJN"), Ex. A (Second Am. Stmt. Of Claim ("SOC"), ¶ 205).  Sathianathan alleged that he was the victim of a Wall Street scandal as important as a recent research analyst scandal unearthed by New York State Attorney General Eliot Spitzer.  (SOC ¶ 5).  He further alleged that the law departments of NASD member firms were systematically conspiring to defend in bad faith against legitimate customer claims.  (Id. ¶ 7).  One element of this scheme was that the firms would defraud stockbrokers out of effective independent legal representation in connection with customer arbitrations.  (Id. ¶ 8).

Sathianathan contended that in his own case, by not entering into a good faith settlement with Venkatramani, Smith Barney and Morgan Stanley had forced Venkatramani to commence an arbitration in which Sathianathan was named. (Id. ¶¶ 53, 56; see also id. ¶ 39). According to Sathianathan, had he been represented by independent counsel, he "could have made a 'plea bargain' deal" with Venkatramani in exchange for helping him with respect to his claims against Smith Barney. (Id. ¶ 90; see also id. ¶ 35). Instead, Smith Barney failed to retain independent counsel for Sathianathan and illegally sought to have Venkatramani dismiss his claims against him without prejudice, which would have deprived Sathianathan of the right to have his claims against Smith Barney heard as part of the same arbitration. (Id. ¶¶ 57, 92). According to Sathianathan, Morgan Stanley was complicitous in this wrongdoing in that it "continually refused to pay for a lawyer of [Sathianathan's] choice" to represent him in the arbitration. (Id. ¶ 36A; see also id. ¶ 84).[2]

The Pacific Exchange deemed Sathianathan's cross-claim against Morgan Stanley untimely because the firm had settled with Venkatramani and been dismissed from the proceeding before it was filed. Smith Barney answered, however, denying Sathianathan's allegations and filed a counterclaim against him seeking, among other relief, contribution and indemnification as a result of its settlement with Venkatramani (the "Smith Barney Claim"). (See FAC ¶ 196; RJN, Ex. B). In connection with the

---

[2]    Sathianathan and Venkatramani later resolved their differences in June 2003. (See FAC ¶ 192).

Sathianathan and Smith Barney Claims, Sathianathan appeared <u>pro se</u>; Smith Barney was represented by KYL.  (<u>See</u> RJN, Ex. B).

D.    Pacific Exchange Arbitration

The Pacific Exchange heard evidence regarding the Sathianathan and Smith Barney Claims over the course of ten days in March 2004.  (FAC ¶ 198).  Thereafter, on April 7, 2004, the panel issued a written award ("Award"), in which it found that the Sathianathan Claim lacked merit and that Smith Barney was entitled to the dismissal of his claim.  (<u>Id.</u> ¶ 201; Award at 4).  The panel also awarded nominal damages to Smith Barney on its claim.  (<u>See</u> Award at 4).  The panel summarized its Award, insofar as relevant, as follows:

1.    FINDINGS OF FACT

. . .

    a.    . . . Smith Barney and Mr. Sathianathan share responsibility for Mr. Venkatramani's damages.

    b.    . . . Smith Barney paid $5,000,000 to Mr. Venkatramani in settlement of his claims.

2.    DECISION

. . .

    a.    [Sathianathan] has not met the burden of proof to show illegal activity, or willful or negligent disregard of [his] rights.

    b.    [Smith Barney] has not met the burden of proof to show that [Sathianathan's] claims were frivolous, nor that the fault in causing damages to Mr. Venkatramani lies substantially with Mr. Sathianathan.

3.    AWARD

12

a.     Monetary damages:  Mr. Sathianathan shall pay to . . . Smith Barney the amount of Ten Thousand Dollars ($10,000) as contribution for the Venkatramani settlement.

b.     Punitive damages:   None.

(FAC ¶ 625; Award at 4-5).[3]

E.     Other Proceedings

Following the Award, Sathianathan filed a total of seven additional actions or proceedings and has expressed a desire to file at least one more.  Additionally, the NASD brought an enforcement action against him.  Those proceedings and actions may be summarized as follows:

1.     California Proceedings

a.     Federal Suit

On May 28, 2004, in an effort to vacate what he alleges was a "corrupt" Award, Sathianathan filed a "Complaint and Motion to Vacate Arbitration Award" in the United States District Court for the Northern District of California.  (See FAC at 555 & ¶¶ 162, 166-69).  Smith Barney was the only defendant named in that suit.  (Id. at 555). On July 27, 2004, Smith Barney filed a motion to dismiss, or, in the alternative, to confirm the Award.  (See FAC at 556 & ¶ 162; see also Moving Defs.' Suppl. P. & A. in

_____

[3]     The signature pages of two of the three arbitrators signing the Award contained a clerical error.  (See Award at 5; RJN, Ex. C at 2).  Accordingly, the Pacific Exchange sent the parties a corrected Award on June 29, 2004, along with a cover letter stating  that "[n]othing in this re-service alters the substance of the Award."  (See RJN, Ex. C at 2 ).

Supp. of Mot. to Dismiss ("Defs.' Suppl. P. & A."), Ex. A). Thereafter, Sathianathan

requested leave to amend his complaint. (Defs.' Suppl. P. & A., Ex. A).

By order dated February 24, 2005, the district court granted Smith Barney's

motion to confirm the Award, denied Sathianathan's motion to vacate the Award, and

struck Sathianathan's motion for leave to amend his first amended complaint for failure to

submit the memorandum of points and authorities required by local rule. (Id. at 16).

After an unsuccessful appeal to the Ninth Circuit, and other procedural wrangling, the

court granted Sathianathan leave to file a further amended complaint by July 6, 2005.

(See Munz Decl., Ex. E; Docket No. 72, Attach. 3 at 15; Docket No. 87 at 6 n.1).

On July 5, 2005, Sathianathan filed a second amended complaint. (See

Docket No. 86 (Notice of Order) Attach. at 2; Docket No. 87 at 6 ). Thereafter, by order

dated October 11, 2005, the district court dismissed that complaint with prejudice on,

inter alia, res judicata and collateral estoppel grounds. (See Docket No. 86 Attach. at 2).

More recently, despite the dismissal of the second amended complaint,

Sathianathan has filed "ex parte" applications to amend that pleading further to add as

parties defendant the court reporting service and reporters who prepared the 2800-page

transcript of the Pacific Exchange arbitration and the KYL Defendants. (See letter dated

Nov. 14, 2005, from David N. Kittredge, Esq., to the Court, at Exs. H & I).

During a telephone conference held on February 24, 2006, Sathianathan

informed the Court that the district court had not yet ruled on his application to name the court reporters as defendants.[4]  Sathianathan also disclosed that he filed two motions, pursuant to Rule 60 of the Federal Rules of Civil Procedure, seeking to set aside the Award and the order dismissing his complaint with prejudice.  The district court evidently held a hearing on January 31, 2006, during which his motion seeking relief from the order dismissing the complaint was denied.  Because Sathianathan had appealed from the order confirming the Award, the district court reserved decision on his second motion until the Ninth Circuit decided whether to remand the case.  Thereafter, Sathianathan filed a motion for reconsideration of the order denying dismissal of his complaint, and Smith Barney filed a motion for reconsideration of the court's decision not to deny the Rule 60 motion seeking relief from the order confirming the Award.  Both motions remain sub judice.

b.      State Court Suit

On September 16, 2004, while the suit in the Northern District of California was pending, Sathianathan filed another motion to vacate the Award in the Superior Court for the County of San Francisco.  Sathianathan describes that suit as a 'back-up" in case Smith Barney prevailed on its motion to dismiss Sathianathan's federal complaint for lack of subject matter jurisdiction.  (See FAC at 556 & ¶¶ 205, 207).  On December 30, 2004, and, again, on January 5, 2005, the Superior Court entered judgments dismissing that

_____

[4]      There is apparently a question as to whether this application was properly noticed.

action.  (See Muntz Decl., Ex. F).  Sathianathan apparently concedes that the state court

action was properly dismissed as untimely.  (See FAC at 556).

### 2. NASD Arbitration

In early 2003, Sathianathan also commenced an arbitration proceeding

against Morgan Stanley before the NASD.  In that proceeding, Sathianathan sought to

bring, "among other causes of action, claims for wrongful termination and legal

malpractice."  (See FAC at 556-57 & ¶¶ 432-33, 550).  During the February 24, 2006

telephone conference, Sathianathan informed the Court that the NASD arbitration had

been "suspended" in July 2005, pending the resolution of this action.

### 3. NASD Enforcement Action

On October 23, 2003, following Smith Barney's filing of the U-5 Form

describing the Venkatramani claim, the NASD brought an enforcement action against

Sathianathan. (See FAC ¶ 597; RJN Ex. E ("NASD Dec.")).  Sathianathan attempted to

bring a counter-complaint in that proceeding against the NASD investigator and attorney

assigned to his case, but the hearing officer dismissed that pleading because the NASD

Code of Procedure did not permit it to be maintained.  (NASD Dec. at 2).  Despite that

dismissal, Sathianathan contended that Smith Barney had worked closely with the NASD

to bring about the charges against him, a claim which the hearing officer flatly rejected.

(Id. at 2-3).

The NASD complaint alleged that Sathianathan made unsuitable recommendations to Venkatramani and another customer to purchase Class B mutual fund shares on margin, instead of Class A shares that had lower fees and charges, in violation of the NASD's rules; failed to disclose material facts in connection with the sales of those shares to the customers, in violation of the NASD rules and Rule 10b-5; and engaged in unauthorized discretionary trading in Venkatramani's account. (Id. at 2).

After a two-day hearing before a hearing panel, the NASD hearing officer issued a decision on its behalf which found that, in 2000, Venkatramani was a 29-year old employee of Juniper Networks, Inc., an internet company the stock of which was rated as speculative.[5] (Id. at 4). Venkatramani, who was an unsophisticated investor, first opened a Smith Barney account in California. He then opened a second Smith Barney account in May 2000 with Sathianathan in Smith Barney's Little Falls, New Jersey, office. His new account application for the second account indicated that Venkatramani had a net worth of $10 million, an aggressive risk tolerance, and investment goals which included speculation – which was not an accurate profile. Sathianathan testified that he marked the Venkatramani account opening documents in this fashion, in keeping with his routine practice, because it would allow him to recommend the broadest range of investments and permit options trading. As he explained, "I didn't realize that this was treated as very important." (Id. at 7).

---

[5]     Indeed, between April 2000 and September 2001, the price of Juniper stock went from $233 to less than $10 per share. (Id. at 4).

After the Venkatramani New Jersey account was opened, it held 60,500 shares of Juniper stock which were then valued at approximately $13.8 million. (Id. at 8). Although Venkatramani wanted to diversify his holdings and preserve his wealth, Sathianathan recommended that he hold his Juniper shares until February 2001 to qualify for long-term capital gains treatment. (Id. at 7). To diversify the account in the interim, Sathianathan recommended that Venkatramani purchase mutual funds on margin, apparently believing that the risk of a margin call with respect to the Juniper stock was the equivalent of "a meteorite hitting New York City tomorrow." (Id. at 7-8).

On Sathianathan's recommendation, Venkatramani bought $200,000 worth of Class B shares of each of fourteen mutual funds on margin. (Id. at 8). By arranging the purchases in this fashion, Sathianathan avoided a Smith Barney restriction against a registered representative purchasing more than $250,000 of such shares in any one fund.[6] (Id. at 8-9). Each of the funds that Sathianathan recommended also offered Class A shares which had different sales loads, expenses and commission credits. (Id. at 9). Because Sathianathan recommended Class B shares, he earned higher commissions than he would have earned on Class A shares. (Id. at 11, 34).

Sathianathan also arranged for Venkatramani to make other purchases in his New Jersey account, including index warrants issued by Smith Barney, which he recommended because they offered a six percent sales commission. (Id. at 12-13).

---

[6]     Several of the funds that Sathianathan purchased for Venkatramani themselves had such restrictions. (Id. at 10).

Additionally, as the market turned against Venkatramani, Sathianathan recommended that he purchase additional mutual fund shares to "average down his cost." (Id. at 13). By the end of 2000, Venkatramani owned $3.9 million worth of mutual fund shares, all acquired on margin. (Id. at 13-14).

On November 30, 2000, Smith Barney reduced Venkatramani's Juniper shareholdings by 13,500 shares to correct a clerical error. (Id. at 14). After this adjustment, his Juniper shares were worth only $5.9 million at year end. (Id.). Although further decreases in the Juniper stock price led to margin calls in Venkatramani's account in 2001, Sathianathan recommended against the sale of any Juniper shares, evidently believing that the price would rebound. (Id.). He conceded in a later interview, however, that his original recommendation that Venkatramani buy the mutual funds on margin, rather than taking steps to protect his net worth, was an error. (Id. at 15).

Following Sathianathan's move to Morgan Stanley, and the transfer of Venkatramani's account, Sathianathan purchased more than $1 million worth of Juniper shares for Venkatramani's account. (Id.). Although Sathianathan claimed that he had time and price discretion for these trades, the NASD found that he did not because there had been no specific discussion of such authority being delegated. (Id.). In reaching this conclusion, the NASD relied on an email in which Sathianathan admitted to Venkatramani that he had bought the Juniper shares while Venkatramani was in India "purely based on what he thought was a strong family relationship that he and

[Venkatramani] had through the fact that one of [Venkatramani's] best friends is Sathianathan's brother."  (Id. at 32-33 (emphasis added)).

The other Sathianathan customer, identified only as "SS," was a Juniper employee referred to Sathianathan by Venkatramani.  (Id. at 16).  The account opening paperwork for SS's Smith Barney account contained customer profile misstatements similar to those found in the Venkatramani account.  (Id. at 16-17).

In August or September 2000, SS asked Sathianathan how to protect the value of his Juniper stock.  (Id. at 17).  After Sathianathan said that he could place a "collar" around his stock,[7] SS instructed Sathianathan to do so, but Sathianathan ignored this instruction, explaining to SS that he was sure the price of Juniper stock would rise in late 2000.  (Id. at 17-18).

In November 2000, SS instructed Sathianathan to sell enough Juniper shares so that he could purchase a home the following month.  Because Sathianathan once again failed to honor this request, Venkatramani had to use his Smith Barney credit line to complete the transaction.  (Id. at 19).

Sathianathan also made purchases for SS of some of the same Class B mutual funds that he had purchased for Venkatramani.  (Id.).  At SS's insistence, however, Sathianathan sold some of SS's Juniper shares to fund these acquisitions.  (Id.).

---

[7]     A collar is a two-transaction options strategy involving both a protective put and a covered call.  (Id. at 18 n.75).

In deciding which of the funds to purchase, Sathianathan did not consider SS's individualized circumstances.  (Id.).

Based on these findings, the NASD concluded that Sathianathan had violated its rules by making unsuitable recommendations to Venkatramani and SS and engaging in unauthorized trading for Venkatramani.  (Id. at 33, 37).  The NASD found Sathianathan's suitability violations to be egregious because he "blatantly disregarded his customers' financial situations and needs, abused their trust, and recommended investments to increase his commissions."  (Id. at 33 ).  The NASD also relied on Sathianathan's refusal to accept responsibility for his misconduct and his attempt to shift responsibility to his former firms and supervisors as factors auguring in favor of a permanent bar.  (Id. at 33-34).  The NASD further noted that Smith Barney had placed Sathianathan on probation in 1999 for failing to maintain the highest levels of professional and ethical behavior, and had specifically directed him at the time to eliminate excessive trading and commissions and employ appropriate diversification and risk management in customer accounts.  (Id. at 35).  The NASD concluded that, in servicing the Venkatramani and SS accounts, Sathianathan ignored these earlier admonitions.  (Id. at 35-36).

For these reasons and others set forth in its detailed opinion, the NASD hearing panel permanently barred Sathianathan from further association with its member firms and ordered him to pay costs of slightly more than $4,000.  (Id. at 38).

4.  New Jersey Actions

a.    First Federal Suit

As a result of what he perceived as improprieties in the NASD proceedings, Sathianathan filed an action against the NASD in the United States District Court for the District of New Jersey on November 19, 2003.  In his complaint, Sathianathan alleged that he was entitled to relief under the Sarbanes-Oxley Act, which "protects whistleblowers and other conscientious employees of NASD member firms from retaliation by the NASD and the NASD member firms."  (FAC at 557 & ¶ 604).  In September 2004, District Judge William Walls dismissed this action without prejudice due to Sathianathan's failure to exhaust his administrative remedies.  (See FAC at 558 & ¶ 605).  Sathianathan did not appeal this decision since it was clear the district judge "had taken the time to read [his] Complaint . . . in detail."  (Id. ¶ 605).

b.    State Court Suit

In mid-June 2003, Sathianathan also filed a complaint in New Jersey Superior Court against the Bressler Defendants, whom he described as "the purportedly independent outside legal counsel that Smith Barney and Morgan Stanley had purportedly hired to independently represent [Sathianathan] and whom Morgan Stanley had coerced [Sathianathan] into accepting as [his] lawyers for the Pacific Exchange Arbitration."  (Id. at 556 & ¶ 583; see also Aff. of Diana C. Manning, Esq., sworn to on Mar. 25, 2005 ("Manning Aff."), Ex. A).  In his 109-page third amended complaint in that proceeding, Sathianathan repeated many of the allegations of attorney misconduct that he previously had advanced in his first federal suit in New Jersey.  On the basis of those allegations,

Sathianathan asserted no less than thirty-eight claims, including legal malpractice, conspiracy to deprive him of effective legal counsel, fraud, defamation, and breach of the implied covenant of good faith and fair dealing. (See Manning Aff. Ex. A).

On March 26, 2004, Judge Theodore Winard dismissed Sathianathan's third amended complaint with prejudice for failure to state a claim upon which relief could be granted, and he also denied Sathianathan's motion for leave to amend. (See FAC at 556 & ¶ 626; Manning Aff. Ex. B). The Judge issued his decision from the bench after hearing oral argument, stating in part:

> The operative facts do not provide [] prima facie evidence that any of the alleged causes of action can arguably or gratuitously viewed, serve as a proximate cause of the loss of [Sathianathan's] job with Morgan Stanley. . . .

(Manning Aff. Ex. C (Mar. 26, 2004 Tr.) at 70). Sathianathan appealed the dismissal of his complaint to New Jersey's Appellate Division. (FAC at 556 & ¶ 627). During the February 24, 2006 telephone conference, the parties advised the Court that the Appellate Division held oral argument on February 7, 2006, but has not ruled.

c.    Second Federal Suit

Since the commencement of this action, Sathianathan also has filed a complaint against the Pacific Exchange in the District Court of New Jersey. (See Muntz Decl., Ex. I). The complaint in that action, which was filed on March 22, 2005, again alleges that there were various infirmities in the conduct of the Pacific Exchange arbitration, including racial bias in the Exchange's practices and procedures. (Id.).

Sathianathan seeks to recover $9.9 million in compensatory damages and $49.9 million in punitive damages on various theories, including breach of contract, negligent interference with prospective business advantage, and federal civil rights violations. (Id. ¶ 63). In a Rule 11 certification at the end of his complaint, Sathianathan identifies some of the other proceedings in which he has been a participant, stating that he also intends to "sue the NASD for its arbitrator selection practices and for allowing the NASD member firms to peremptorily challenge non-white arbitrators off the arbitration panels." (Id. at 28). Sathianathan promises that this is the "last lawsuit" that he intends to file "as part of [his] civic duty to expose industry-wide activities on Wall Street." (Id.).

III.   This Lawsuit

As might be expected, the procedural history of this action is also involved. At present, seven motions are pending. First, on January 11, 2005, the Bressler Defendants moved to strike the FAC. (See Docket No. 5). Second, on January 25, 2005, the Moving Defendants moved to dismiss the FAC pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure. (See Docket No. 23). Third, on March 16, 2005, at the same time that he filed his brief in opposition to the Moving Defendants' motion, Sathianathan sought leave to amend the FAC. (See Docket Nos. 48-49). Fourth, on March 25, 2005, the Bressler Defendants supplemented their motion to strike by filing a motion to dismiss the FAC, in which, among other things, they sought to join in the Moving Defendants' prior motion to dismiss. (Docket No. 53). Fifth, on June 14, 2005, the Moving Defendants filed a motion for vexatious litigant determination and sought to

enjoin Sathianathan from filing any further related litigation. (See Docket No. 68). Sixth, on June 29, 2005, Sathianathan filed a motion seeking the imposition of sanctions for the filing of a frivolous motion to have him declared a vexatious litigant. (See Docket No. 73). Finally, on December 19, 2005, Sathianathan filed an ex parte application to amend the FAC to name as defendants the court reporters and reporting service that transcribed the Pacific Exchange arbitration proceedings. (Docket No. 94).

IV.    Discussion

    A.    Jurisdiction

The FAC does not contain the short and plain statement of the grounds upon which the Court's jurisdiction rests required by Rule 8(a) of the Federal Rules of Civil Procedure. Nevertheless, it is apparent that jurisdiction in this case cannot be founded on diversity of citizenship since the FAC alleges that Sathianathan is a resident of New Jersey and that the Bressler firm is incorporated and headquartered in that state. (See FAC ¶¶ A, 5). The Court nevertheless may consider Sathianathan's RICO and civil rights claims under its federal question jurisdiction, 28 U.S.C. § 1331, and his remaining claims pursuant to its supplemental jurisdiction over related claims, id. § 1367(a).

    B.    Standard of Review

        1.    Rule 8(a)

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Second Circuit has explained that the

> statement should be plain because the principal function of
> pleadings under the Federal Rules is to give the adverse party
> fair notice of the claim asserted so as to enable him to answer
> and prepare for trial . . . . The statement should be short
> because "unnecessary prolixity in a pleading places an
> unjustified burden on the court and the party who must
> respond to it because they are forced to select the relevant
> material from a mass of verbiage."

Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (quoting 5 C. Wright & A. Miller,

Fed. Practice and Procedure § 1281, at 365 (1969)). "When a complaint violates Rule

8(a), the court may, sua sponte or on defendant's motion, strike repetitive or irrelevant

portions or dismiss the complaint." Sleigh v. Charlex, Inc., No. 03 Civ. 1369 (MBM),

2004 WL 2126742, at *8 (S.D.N.Y. Sept. 14, 2004). As Judge Mukasey indicated in

Sleigh, "[d]ismissal is usually warranted only in cases where 'the complaint is so

confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is

well disguised.'" Id. (quoting Salahuddin, 861 F.2d at 42).

Here, it obviously would be a herculean task for the Court to attempt to edit

a complaint which fills more than a ream of paper (exclusive of exhibits). Accordingly,

one option would be to recommend a dismissal without prejudice so that Sathianathan

could redraft the FAC. That alternative, however, would inevitably lead to another round

of briefing in a case in which the Defendants clearly have already spent substantial funds

defending against the various proceedings Sathianathan has instituted. To avoid the

further needless expenditure of such funds, the Court will, instead, assess the viability of

Sathianathan's claims on the basis of the FAC without requiring the submission of a further draft pleading.

### 2. Rule 12(b)(6)

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993); Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999); Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995). The court may grant the motion only when "it appears beyond doubt . . . that the plaintiff can prove no set of facts [in support of his claim] which would entitle him to relief." Sec. Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 68 (2d Cir. 2000) (quoting Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997)); Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992).

When a plaintiff is proceeding pro se, as here, the complaint must be held "to less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam). Accordingly, the allegations must be read "liberally" and interpreted "to raise the strongest arguments that they suggest." Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)).

In keeping with these precepts, although Rule 12(b)(6) generally restricts a court's consideration to the four corners of the complaint, pro se pleadings may be read together to determine whether a plaintiff conceivably could be entitled to relief. See, e.g., Amaker v. Haponik, No. 98 Civ. 2663 (JGK), 2000 WL 343772, at *1 (S.D.N.Y. Mar. 31, 2000); Burgess v. Goord, No. 98 Civ. 2077 (SAS), 1999 WL 33458, at *1 n.1 (S.D.N.Y. Jan. 26, 1999) (considering allegations set forth in plaintiff's opposition papers in deciding defendants' Rule 12(b)(6) motion); Gadson v. Goord, No. 96 Civ. 7544 (SS), 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997) (same); Donahue v. United States Dep't of Justice, 751 F. Supp. 45, 49 (S.D.N.Y. Nov. 7, 1990), abrogated on other grounds, Sosa v. Alvarez-Machain, 542 U.S. 692 (2004) ("The policy reasons favoring liberal construction of pro se pleadings warrant the Court's consideration of the allegations contained in plaintiffs' memorandum of law, at least where those allegations are consistent with the allegations in the complaint.").

Additionally, in deciding a Rule 12(b)(6) motion, "the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference, and such facts as are suitable for judicial notice pursuant to Fed. R. Evid. 201." Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC, 317 F. Supp. 2d 301, 310 (S.D.N.Y. 2003) (citing Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991)).

C.    Res Judicata and Collateral Estoppel

The Smith Barney and Bressler Defendants assert that Sathianathan's claims against them are barred by the doctrine of res judicata (or claim preclusion)

because Sathianathan has brought prior proceedings against them in which the relief presently prayed for could have been sought.  (See Moving Defs.' Mem. in Supp. of Mot. to Dismiss at 10-13; Bressler Defs.' Br. in Supp. of Mot. to Dismiss at 9-15).  Both groups of defendants also invoke the doctrine of collateral estoppel (or issue preclusion) as a basis for the dismissal of Sathianathan's claims.

    1.    Res Judicata

    a.    Smith Barney Defendants

The Smith Barney Defendants base their res judicata claim on the outcome of the Pacific Exchange arbitration, which rejected the Sathianathan Claim.  As the Second Circuit has noted, whether federal or state law should govern the analysis of a res judicata claim based on an arbitral award is an issue that "unfortunately 'has not been much developed.'"  Pike v. Freeman, 266 F.3d 78, 90 n.14 (2d Cir. 2001) (quoting 18 C. Wright, A. Miller & E. Cooper, Fed. Practice & Procedure § 4475, at 772 (2002)).  Here, however, the federal, California, New York and New Jersey cases all seem to agree that res judicata applies when the prior proceeding resulted in a final disposition on the merits, the same parties (or those in privity with them) were involved, and the claims being asserted in the subsequent action were or could have been raised in the prior proceeding. See Pike, 266 F.3d at 90 ("[i]t is well settled that [res judicata] serves to bar certain claims in federal court based on the binding effect of past determinations in arbitral proceedings"); Melikian v. Corradetti, 791 F.2d 274, 279 (3d Cir. 1986) (New Jersey law requires party to bring all related claims against one adversary in a single action or be

precluded from asserting the omitted claims in a second suit); In re Hunter, 794 N.Y.S.2d 286, 291 (2005) ("[res judicata] applies not only to claims actually litigated but also to claims that could have been raised in the prior litigation"); O'Brien v. City of Syracuse, 54 N.Y.2d 353, 357 (1981) ("once a claim is brought to a final conclusion, all other claims arising out of the same transaction . . . are barred, even if based upon different theories or if seeking a different remedy"); McNeil v. Legis. Apportionment Comm'n, 177 N.J. 364, 395 (2003) (for res judicata to apply, "(1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one"); Mycogen Corp. v. Monsanto Co., 28 Cal. 4th 888, 897 (2002) ("Under [the res judicata] doctrine, all claims based on the same cause of action must be decided in a single suit; if not brought initially, they may not be raised at a later date.");  see also Schuykill Fuel Corp. v. B. & C. Nieberg Realty Corp., 250 N.Y. 304, 306-07 (1929) ("A judgment in one action is conclusive in a later one not only as to any matters actually litigated therein, but also as to any that might have been so litigated, when the two causes of action have such a measure of identity that a different judgment in the second would destroy or impair rights or interests established by the first.").

Although res judicata is undoubtedly invoked more frequently in the context

of successive lawsuits, it also applies where, as here, the first proceeding was an arbitration. See, e.g., Zerman v. Bache, No. 83 Civ. 7980 (CBM), 1984 WL 324, at *3 (S.D.N.Y. May 7, 1984) ("The doctrine of res judicata applies to both judicial decisions and arbitration decisions."); Am. Ins. Co. v. Messinger, 43 N.Y.2d 184, 187 (1977) (determination made in arbitration binds same parties in subsequent suit arising out of the same facts); Chattin v. Cape May Greene, Inc., 524 A.2d 841, 851 (N.J. Super. A.D. 1987) ("[T]here is nothing fundamentally unfair or inconsistent with public policy in applying principles of res judicata to bar the arbitrating [class] from litigating any claims" previously arbitrated against the defendant.); Kelly v. Vons Cos. Inc., 67 Cal. App. 4th 1329, 1335 (Cal. App. 2d Dist. 1998) (noting that California courts have found that "claims preclusion applies to arbitration awards as well."). As Judge Casey has noted:

> Arbitration is not a trial run in which a party may sit quietly by without raising pertinent issues, wait to see if the result is in his favor and then seek judicial relief as an afterthought. See Marino v. Writers Guild of Am. East Inc., 992 F.2d 1480, 1483-84 (9th Cir. 1993). If that were the case, arbitration would lose its vitality as an alternative to litigation, which is inconsistent with the strong federal policy favoring arbitration, the enforcement of arbitration agreements and the confirmation of arbitration awards.

Pike, 266 F.3d at 89 (quoting unpub. dec. below).

Here, although the Award in the Pacific Exchange arbitration is admittedly terse, it seems clear that the Sathianathan Claim incorporated many of the claims that Sathianathan now seeks to press in this lawsuit. For example, in that proceeding, as here, Sathianathan alleged that there was a conspiracy to deprive him of his right to

independent legal representation.  (See Award at 3).  Sathianathan also alleged that Smith

Barney was attempting to cover up its liability for Venkatramani's losses.  (Id. at 2).

Moreover, with the possible exception of his civil rights and RICO claims, any other

claims that he may presently be asserting against Smith Barney could have been presented

to the Pacific Exchange hearing panel as part of his cross-claim.  It also is undisputed that

Sathianathan and Smith Barney were the parties to the arbitration before the Pacific

Exchange.  Finally, even if the Award by itself could not be treated as a final adjudication

on the merits, the United States District Court for the Northern District of California has

confirmed the Award.  (See Muntz Decl. Ex. D).  All three elements required for claim

preclusion to be invoked have therefore been established.

It also bears mention that this Court is not the first to consider the

preclusive effect of the Pacific Exchange arbitration.  After Sathianathan filed his second

amended complaint in the Northern District of California action, Smith Barney moved for

its dismissal.  (See Docket No. 86 Attach. at 2; Docket No. 87 at 6).  In words that are

equally dispositive here, the district judge in that case held that the second amended

complaint "fail[ed] to state a cause of action on the grounds that the averments in [that

c]omplaint are precluded based upon the doctrine of res judicata . . . .  Further, any claims

that [Sathianathan] could have litigated in the Sathianathan Claim are also precluded."

(See Docket No. 86 Attach. at 2).

For these reasons, the Smith Barney Defendants are entitled to the dismissal

of the claims in the present lawsuit on res judicata grounds, except insofar as

Sathianathan seeks to assert RICO or civil rights claims.[8]

> b.  Bressler Defendants

In his state court suit in New Jersey, Sathianathan brought myriad claims

against Amery and the Bressler firm which Judge Winard dismissed with prejudice after

hearing argument.  (See Manning Aff. Exs. A, C).  For that reason, Amery, the Bressler

firm, and those in privity with them, are entitled to the dismissal on res judicata grounds

of any claims in the FAC that were or could have been brought in the New Jersey state

court suit.

Seeking to avoid the application of the res judicata doctrine to his claims

against the Bressler Defendants, Sathianathan advances several arguments.  First, he

contends that New Jersey's "entire controversy" doctrine is inapplicable here because

New York law is controlling.  (See Pl.'s Br. in Opp. of Mot. to Dismiss at 19-20).

Indeed, he asserts that "most of the injury inflicted on [him] occurred in New York."  (Id.

at 19).  Assuming, arguendo, that New York law is applicable, res judicata still bars

---

[8]  As the party asserting a res judicata defense, Smith Barney bears the burden of
showing that each of Sathianathan's claims could have been asserted in the Pacific Exchange
arbitration.  See, e.g., Computer Assocs. Int'l, Inc. v. Altai, Inc., 126 F.3d 365, 369 (2d Cir.
1997) ("The burden is on the party seeking to invoke res judicata to prove that the doctrine bars
the second action.").  No such showing has been made with respect to Sathianathan's RICO or
civil rights claims, nor is there any reason to believe that these claims would have been
entertained there.

Sathianathan's present claims against the Bressler Defendants to the extent that they could have been brought in an earlier action. See Hunter, 4 N.Y.2d at 269.

Sathianathan argues that his RICO claims against the Bressler Defendants could not, in fact, have been brought as part of the New Jersey state court action because the relevant facts were concealed from him. (See Pl.'s Br. in Opp. of Mot. to Dismiss at 21). Conspicuously absent from Sathianathan's papers, however, is any indication of the information that allegedly was withheld. In the absence of any details, there is no basis upon which this Court can conclude that there is a claim that Sathianathan could not have brought in the New Jersey state court action because it was intentionally concealed.

In a related vein, Sathianathan also asserts that certain of the events on which his claims in this action are based had not occurred by the time he instituted the New Jersey state court action. Once again, Sathianathan fails to indicate what those later events are. In his FAC, however, Sathianathan alleges that the Bressler Defendants traveled from New Jersey to California on March 4, 2004, in order to give false testimony at the Pacific Exchange arbitration. Sathianathan also suggests in his opposition papers that he did not discover the Bressler Defendants' "prior acts of racism" until after the Pacific Exchange arbitration. (Id. at 22). At best, these matters could breathe life into some of Sathianathan's claims, such as his RICO and civil rights claims. Such later events would not entitle Sathianathan to circumvent the preclusive effect of his earlier suit in its entirety.

Sathianathan also alleges that res judicata does not apply because the New

34

Jersey lawsuit named only Amery and the Bressler firm as defendants while the FAC in this case names other parties. The parties to both suits need not be identical, however, for the doctrine of res judicata to apply. <u>See</u> <u>Matter of the State of New York v. Seaport Manor A.C.F.</u>, 797 N.Y.S.2d 538, 539-40 (2d Dep't 2005) ("the doctrine of res judicata not only applies to the parties of record in the prior action, or administrative proceeding, but also to those in privity with them"); <u>Green v. Santa Fe Indus., Inc.</u>, 519 N.Y.S.2d 793, 796 (1987) ("to establish privity the connection between the parties must be such that the interests of the nonparty can be said to have been represented in the prior proceeding"). What is necessary is that the persons seeking to invoke res judicata (or other parties in privity with them) have been parties to both actions. Here, there is no dispute that this is so.

Finally, Sathianathan asserts that the interests of justice would be served by federal judicial review of the "bizarre actions" of the New Jersey state court judge. (<u>See</u> Pl.'s Br. in Opp. of Mot. to Dismiss at 22). Contrary to this assertion, the transcript of the oral argument before Judge Winard reflects his careful consideration of the positions espoused by both sides. (<u>See</u> Manning Aff. Ex. C). The doctrine of res judicata exists precisely because it is <u>not</u> in the interests of justice for courts to relitigate issues which have or could have been decided in earlier proceedings. Accordingly, Sathianathan's invitation to ignore established legal principles in order to afford him yet another bite at the apple should be declined.

     2.    <u>Collateral Estoppel</u>

The doctrine of collateral estoppel, or issue preclusion, is similar to res judicata in that it protects both parties and the courts from the burden of relitigating issues previously decided.  See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979).  Additionally, like res judicata, the doctrine also applies to arbitration awards, whether they are confirmed or unconfirmed.  M.J. Woods, Inc. v. Conopco, Inc., 271 F. Supp. 2d 576, 586 (S.D.N.Y. 2003).  "For this Court to rule otherwise would be to upset decades of federal precedent that gives preclusive effect to arbitration decisions."  Id.  Collateral estoppel differs from res judicata in two significant ways.  First, unlike res judicata, collateral estoppel precludes the reassertion of specific issues that were previously litigated even if the second suit involves an entirely different cause of action.  Id. at n.5.  Second, collateral estoppel does not require that the parties to the second lawsuit (or their privities) have been bound by the original judgment.  See Blonder-Tongue Lab. Inc. v. Univ. of Ill. Found., 402 U.S. 313, 327-29 (1971); Parklane Hosiery, 439 U.S. at 326-28.

Collateral estoppel therefore will bar a party from relitigating an issue if (a) the identical issue was raised in the prior proceeding, (b) the issue in the prior proceeding was actually litigated and decided, (c) there was a full and fair opportunity to litigate in the prior proceeding, and (d) the issue previously litigated was necessary to support a valid and final judgment on the merits.  N.L.R.B. v. Thalbo Corp., 171 F.3d 102, 109 (2d Cir. 1999); accord Carney v. Philippone, 332 F.3d 163, 170 (2d Cir. 2003) (quoting Thalbo).  As long as these four criteria are met, collateral estoppel will preclude a party from asserting a claim previously decided against it, even if the parties to the

36

second action are not the same as those appearing in the earlier suit.  Parklane Hosiery,

439 U.S. at 335; Zerman, 1984 WL 324, at *4.

a.    Moving Defendants

The Moving Defendants allege that Sathianathan is collaterally estopped

from bringing his claims against the Smith Barney and KYL Defendants by virtue of the

adverse rulings made by the arbitration panel that heard the Sathianathan Claim.  (Moving

Defs.' Mem. in Supp. of Mot. to Dismiss at 12-13).  In that arbitration, the panel

specifically decided that Sathianathan and Smith Barney shared responsibility for

Venkatramani's loses and that Sathianathan had not established any "illegal activity, or

willful or negligent disregard of [his] rights."  (Award at 4).  As the Award indicates, as

part of the second of these determinations, the panel necessarily found that Sathianathan

had failed to show that:

1.    "The Smith Barney Legal Department interfered with [his] employment at Morgan Stanley."

2.    "The Smith Barney Legal Department conspired to deprive and [d]efraud [him] out of effective, independent legal representation for the customer complaint."

3.    "The Smith Barney Legal Department retaliatorily and maliciously defamed [him] by filing [a] U-5 [Form] with the NASD with language that was published with reckless disregard for the truth or falsity of the allegations."

4.    "The Smith Barney Legal Department interfered with [his] legal representation by Bressler, Amery & Ross."

5.    "The Smith Barney Legal Department conspired to oppress [his] rights as an independent party to the customer arbitration by denying

37

[him] the ability to have [himself] removed as a named party to the . . . arbitration."

6. "The Smith Barney Legal Department's conspiring behind [his] back with [his] purportedly independent outside legal counsel who had been recommended by Morgan Stanley forced [his] then employer Morgan Stanley to fire [him] at the first pretext as part of Morgan Stanley's attempt to mitigate Morgan Stanley's liability towards [him]."

7. "The Smith Barney Legal Department committed Perjury and Obstruction of Justice in the arbitration as part of the Smith Barney Legal Department's attempt to cover-up its unlawful activities in response to a customer complaint."

8. "After the cutoff for discovery and after holding Mediation with the customer, the Smith Barney Legal Department knowingly and willfully submitted fraudulent documents for the purpose of depriving and defrauding [him] out of [his] defenses against the NASD investigation against [him] which had been triggered and guided by the Smith Barney Legal Department."

(Award at 2-3). Accordingly, Sathianathan is bound by these determinations and cannot seek to relitigate them in this forum.

b. Bressler Defendants

In both this action and the earlier New Jersey state court action, Sathianathan alleged, in substance, that the Bressler Defendants failed to provide him with independent representation because they had an undisclosed conflict of interest and conspired, together with Smith Barney, to ruin his life, reputation, and career. (Compare Manning Aff. Ex. A ¶¶ 59-74 with FAC ¶¶ 337-50). Sathianathan also reasserts in this

38

action his prior allegations against the Bressler Defendants (and specifically Amery) concerning their alleged breach of his attorney client privilege.  (Compare Manning Aff. Ex. A ¶¶ 83-100 with FAC ¶¶ 89-94, 179, 362-63, 469).  Accordingly, at least with respect to these issues, Sathianathan's allegations regarding Amery and the Bressler firm in both actions are identical.

It also cannot be disputed that Judge Winard's dismissal of the New Jersey state court action with prejudice for failure to state a claim for relief constituted a judgment on the merits.  See Federated Dep't Stores, 452 U.S. at 399 n.3; Velasquez, 123 N.J. at 589; Fed. R. Civ. P. 41(b).  Additionally, as the record of the New Jersey state court action makes clear, Sathianathan was afforded a full and fair opportunity to litigate his claims before that dismissal.  Indeed, those claims were dismissed only after Sathianathan had been afforded an opportunity to file three amended complaints and the court had heard extensive oral argument.  (See Manning Aff. Exs. A, C).  Finally, it is clear that Judge Winard "scrutinized" Sathianathan's allegations against Amery and the Bressler firm with "great care" before he decided that there was no factual basis for Sathianathan's claims of "fraud, legal malpractice, breach of a fiduciary duty, breach of trust, negligence, conspiracy, a conspiracy to defraud [him] out of a cross claim on a def[a]mation claim, fraudulent concealment, def[a]mation, intentional infliction of emotional distress" and "perjury."  (Id., Ex. C at 63-65).  On the basis of that review, Judge Winard concluded that "[t]he operative facts do not provide [] prima facie evidence

that any of the alleged causes of action can arguably or gratuitously viewed, serve as a proximate cause of the loss of the plaintiff's job with Morgan Stanley." (Id. at 70).

For these reasons, Sathianathan is collaterally estopped from reasserting the claims that he now seeks to bring against the Bressler Defendants in this proceeding. Accordingly, the Bressler Defendants' motion to dismiss Sathianathan's claims against them should be granted and those claims dismissed with prejudice.

As discussed below, even if the Smith Barney and Bressler Defendants could not invoke the doctrines of res judicata and collateral estoppel to bar Sathianathan's present claims, many of his causes of action still would be subject to dismissal, as a matter of law, on the merits.

D. Federal Claims

1. RICO

Sathianathan's first three causes of action arise under the RICO statute. In the first such cause of action, Sathianathan alleges that the Smith Barney, Bressler, and KYL Defendants violated 18 U.S.C. §§ 1962(b), (c) and (d) through their actions in the Pacific Exchange arbitration, which Sathianathan considers part of a wide-ranging scheme to defraud stockbrokers against whom customer complaints have been made. (FAC ¶¶ 1046-56). Sathianathan alleges that these actions resulted in considerable financial harm to him, including his loss of a $450,000 Morgan Stanley signing bonus and the ability to earn his living as a stockbroker. (Id. ¶¶ 1057-63).

In his second RICO cause of action, Sathianathan alleges the existence of a conspiracy, in violation of 18 U.S.C. § 1962(d), involving some or all of the Smith Barney, Morgan Stanley, KYL, and Bressler Defendants, to have Sathianathan reveal his confidences to Amery so that he could impermissibly share that information with others. (Id. ¶¶ 1134-45). Overlapping the allegations of his first cause of action, Sathianathan also alleges in this claim that certain Defendants helped perpetrate a fraud on the Pacific Exchange hearing panel in order to procure an Award to which Smith Barney was not entitled and then cover up their wrongdoing. (Id. ¶¶ 1156-58, 1160-65).

Finally, in his third RICO cause of action, Sathianathan seeks treble damages, attorney's fees (even though he is proceeding pro se), and other costs pursuant to 18 U.S.C. § 1964. (Id. ¶¶ 1176-80, 1194-95). To obtain relief under Section 1964, however, Sathianathan first must establish a violation of RICO which caused him injury. Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23 (2d Cir. 1990).

a.    Sections 1962(b) and (c)

To the extent that Sathianathan alleges substantive violations of the RICO statute, one of the showings that he necessarily must make is that the Defendants engaged in a "pattern" of racketeering activity related to the alleged enterprise. See H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 238-39 (1989). Although the statute requires that there be at least two predicate acts of racketeering within a ten-year period, see 18 U.S.C.

§ 1961(5), this alone is not enough to meet the pattern requirement.  See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14 (1985).  Rather, the predicate acts must also demonstrate that the alleged scheme entailed continuing, or at least the threat of continuing, activity.  Id.  When a complaint relies on predicate acts of mail or wire fraud, the plaintiff also must comply with Rule 9(b) of the Federal Rules of Civil Procedure by alleging the fraudulent circumstances with particularity, "including the relevant details of each act, such as when it was committed and how it was fraudulent."  Rivera v. Golden Nat'l Mortgage Banking Corp., No. 04 Civ. 4545 (RMB), 2005 WL 1514043, at *3 (S.D.N.Y. June 27, 2005).  Thus, when the plaintiff's allegations of fraud rely on statements, the plaintiff must specify:  (i) the statements the plaintiff thinks were fraudulent, (ii) the speaker, (iii) the time and place the statements were made, and (iv) why the plaintiff believes the statements are fraudulent.  See Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir. 1995); McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir. 1992).

Here, Sathianathan has failed to meet these basic requirements.  First, the RICO statute specifies which crimes can constitute a predicate act of racketeering.  From the face of the FAC, it appears that the only potentially applicable crimes Sathianathan alleges are mail and wire fraud.  See 18 U.S.C. § 1961(1)(B).  Nevertheless, in his RICO case statement ("RICO Case Stmt."), first submitted to the Court several months after the motions to dismiss were filed, Sathianathan also alleges that the Defendants violated the Hobbs Act, 18 U.S.C. § 1951, by engaging in extortion.  (See Docket No. 66).

Accordingly, I have considered Sathianathan's claims with respect to both types of predicate acts.

The crime of extortion, insofar as relevant here, requires a showing that a defendant obtained another person's property with his consent, where the consent was brought about through the use or threatened use of force, violence or fear. 18 U.S.C. § 1951(b)(2); Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 400 (2003). In his RICO case statement, Sathianathan alleges that an engagement letter sent to him by Morgan Stanley's in-house counsel used "extortive coercive language" because it said that the firm "reserve[d] the right to charge back current employees" the amount of adverse judgments or settlements and to take disciplinary action against them. (RICO Case Stmt. at 50-51). Similarly, Sathianathan alleges that the fear of economic loss resulting from his possible termination constituted "extortive coercion" that led to his attendance at the meeting on December 13, 2001, at Morgan Stanley's Law Division. (Id. at 53). These and other comparable allegations do not, by any stretch of the imagination, rise to the level of a criminal Hobbs Act violation. See e.g., United States v. Clemente, 640 F.2d 1069, 1077 (2d Cir. 1981) ("It is obvious that the use of fear of financial injury is not inherently wrongful."); see also Wooley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 290 (1985), modified, 101 N.J. 10 (1985) (employee presumed to be employed at will absent an agreement or manual to the contrary).

Turning to the alleged acts of mail and wire fraud upon which Sathianathan relies, the RICO statute provides that "[a]ny person injured . . . by reason of a violation of

43

section 1962 . . . may sue therefor" and recover treble damages. 18 U.S.C. § 1964(c) (emphasis added). In Holmes v. Secs. Inv. Prot. Corp., 503 U.S. 258, 268 (1992), the Supreme Court held that this language requires a plaintiff to show that the defendant's conduct was the proximate cause of the plaintiff's injury. This, in turn, means that a plaintiff alleging a pattern of mail or wire fraud predicate acts as part of a civil RICO claim must show that he reasonably relied on the defendant's misrepresentations or failures to disclose. See Bank of China, N.Y. Branch v. NBM LLC, 359 F.3d 171, 177-78 (2d Cir. 2004); Metromedia Co. v. Fugazy, 983 F.2d 350, 368 (2d Cir. 1992). Many of the acts of mail or wire fraud cited in Sathianathan's RICO case statement clearly fail to meet this requirement because they are based on false or misleading representations that one or more of the Defendants made to third parties regarding matters that Sathianathan must have known or believed were untrue. (See, e.g., RICO Stmt. at 48 ("Smith Barney claimed at the Pacific Exchange arbitration that, as is their usual procedure, Smith Barney had mailed me a copy of [its] November 16, 2001 U-5 filing"), 59 ("During mid-February 2002, Morgan Stanley (in New York) made a false filing with the NASD (in Maryland) using interstate wires that I had resigned.")).[9] Obviously, if

---

[9]      Sathianathan contends that the information in the U-5 Form must be fraudulent because the NASD later "ruled that [h]e did not commit fraud[,] breach [his] fiduciary duty[,] make misrepresentations to [his clients, or engage in] unauthorized trading." (RICO Case Stmt. at 47). This is a gross overstatement. At the outset, the NASD panel expressly found that "Sathianathan placed his own interests in garnering commissions above his customer's interests, thereby violating his fundamental obligation of fair dealing." (NASD Dec. at 34). Second, the NASD did not absolve Sathianathan with respect to the fraud charged; instead, it simply concluded that the charges could not be proven because Venkatramani and SS's limited
(continued...)

Sathianathan knew that statements were false or misleading, <u>he</u> could not have relied on them.

Other alleged predicate acts of mail or wire fraud relate to the legal services furnished to Sathianathan by Morgan Stanley and later the Bressler Defendants. For example, Sathianathan alleges that the mailing of two retainer letters to him constitutes predicate racketeering acts. Both letters are appended to the FAC. (<u>See</u> FAC Ex. Set One, Tabs 3 & 11). In the first letter, dated November 16, 2001, Yellen stated that, [b]ased upon my inquiry and the information provided to me about the facts of this case, there does not appear to be an actual conflict between Morgan Stanley and you in the pursuit of [our] common interest," which the letter defined as "defeating [Venkatramani's] claims." (<u>Id.</u> Tab 3 at 2). The Yellen letter also expressly noted, however, that a conflict could later arise and that Sathianathan waived any such conflict. (<u>Id.</u> at 2-3).

Sathianathan contends that the mailing of the Yellen letter constitutes an act of mail fraud because "Morgan Stanley had already started conspiring with [his] enemy Smith Barney . . . and . . . Yellen was aware that, if [Sathianathan] discovered the conspiracy, there would be a conflict between Morgan Stanley and [him] with respect to

---

[9](...continued)
cooperation left only Sathianathan's own on-the-record statements as proof. (<u>Id.</u> at 30-33). Finally, the NASD expressly stated that Sathianathan bought 33,000 shares of Juniper stock for Venkatramani without his written authorization. (<u>Id.</u> at 32-33). The only reason a separate sanction was not imposed for this violation was that the panel concluded that it "would be redundant, and [that] a monetary fine would serve no additional remedial purpose." (<u>Id.</u> at 38).

Morgan Stanley's conspiracy against [him]." (RICO Case Stmt. at 49). This, however, is sheer conjecture. Sathianathan also contends that Yellen concealed the fact that Sathianathan would need another lawyer to represent him in connection with the Smith Barney portion of the case. (Id. at 50). Assuming that Yellen had so concluded, there is nothing in his letter to Sathianathan which suggests the contrary. In short, on it face, the letter does not give rise to a viable mail fraud charge.

In the second letter, which is dated December 27, 2001, Amery confirmed the Bressler firm's retention and that

> Bressler, Amery & Ross, P.C. will perform services for you on an hourly basis. Invoices will be rendered monthly for services performed during the month along with disbursements incurred on your behalf during the month.

(FAC Ex. Set One, Tab 11 at 1). The letter goes on to state that

> . . . Smith Barney. . . and Morgan Stanley . . . have agreed to pay for [Amery's] representation of you in connection with the Venkatramani complaint letter.

(Id. at 2). Sathianathan contends that the first quoted statement is fraudulent because the Bressler firm "had no intention of giving [him] copies of their invoices because their invoices show[ed] the wholesale cooperation of [his] lawyers Brian Amery and Bressler, Amery & Ross with [his] enemy Smith Barney starting as soon as December 14, 2001."[10]

(See RICO Case Stmt. at 56). Sathianathan contends that the second quoted statement is

---

[10]    He notes further that the Bressler firm later refused to give him copies of these invoices. (Id.).

false because Amery now claims that his firm could not have served as Sathianathan's advocate.  (Id.).

Suffice it to say, the allegation that the first of these statements was fraudulent when made is sheer conjecture on Sathianathan's part.  Moreover, because Sathianathan was not expected to pay the bills for any of the services rendered to him, any misstatement plainly is not material.

Similarly, the second statement upon which Sathianathan relies does not suggest that Sathianathan was defrauded since it obviously became clear that Amery and his firm could not represent Sathianathan once he expressed an interest in bringing his own claims against Smith Barney – a client of the Bressler firm – as part of the Pacific Exchange arbitration.

More importantly, even if Sathianathan were able to show the existence of some scheme to defraud him of the honest services of his attorneys – and the use of the mails or interstate wire transmissions in furtherance thereof – it is apparent that the scheme could at most have lasted from late 2001 until early 2002, when the Bressler firm withdrew from any further representation of Sathianathan.  A closed-end scheme of such limited duration which poses no threat of continuity fails to meet the statutory requirement that there be a "pattern" of racketeering activity.  See, e.g., Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) ("To satisfy closed-ended continuity, the plaintiff must prove a series of related predicates extending over a

substantial period of time.  Predicate acts extending over a few weeks or months do not

satisfy this requirement.") (internal quotation marks and ellipsis deleted).

In an effort to extend the period of time during which the predicate acts are

alleged to have occurred, Sathianathan points to other acts which both pre- and post-date

the events surrounding the Venkatramani Claim.  With respect to the former,

Sathianathan points to the facts of <u>Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.</u>, 7

F.3d 1085, 1086 (2d Cir. 1993) (per curiam), another case in which the Bressler firm

represented Smith Barney's co-defendant.  Sathianathan appears to believe that <u>Mian</u>

forms part of a pattern of racketeering within a ten-year period because the plaintiff there

was allegedly defrauded by Smith Barney and Donaldson, Lufkin & Jenrette in "a case

that lasted from 1992 through 1996."  (RICO Case Stmt. at 18).

In <u>Mian</u>, the plaintiff, who was Indian, "complain[ed] that [the] defendants

impermissibly discriminated against him because of his race during the course of an

arbitration proceeding pertaining to the handling of [his] securities accounts by the

defendants." <u>Mian</u>, 7 F.3d at 1086.  Since "that arbitration panel issued its final decision

on June 11, 1991," <u>id.</u> at 1087, any predicate acts related to <u>Mian</u> obviously could not

have occurred within ten years of the earliest predicate acts related to the Venkatramani

or Sathianathan Claims and, hence, are time barred.  <u>See</u> 18 U.S.C. § 1961(5).  Moreover,

Sathianathan's effort to rely on statements that Amery made in 1994 in the <u>Mian</u> lawsuit

as evidence of his knowing participation in a scheme to defraud Mian "out of fair

compensation for the damages inflicted upon [him]," (RICO Case Stmt. at 64) (block

48

capitalization deleted), overlooks the ultimate disposition of the <u>Mian</u> suit.  After <u>Mian</u>

filed an amended complaint alleging that he was the victim of discrimination in

connection with a securities arbitration, and that this gave rise to a RICO violation, Judge

Stanton granted judgment for the defendants, and that decision was affirmed by the Court

of Appeals.  <u>See</u> <u>Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.</u>, No. 92 Civ. 3917

(LLS), 1994 WL 494902, at *6 (S.D.N.Y. Sept. 9, 1994), <u>aff'd</u>, 60 F.3d 810 (2d Cir.

1995) (table), <u>cert. denied</u>, 516 U.S. 824 (1995).  This disposition of <u>Mian</u> precludes

Sathianathan from arguing, more than a decade later, that Mian was defrauded, and that

Amery's statements in furtherance of that alleged fraud constitute predicate racketeering

acts.

Finally, Sathianathan seeks to rely on two recent cases: a "Florida State

Court case involving Morgan Stanley and Ron Perlmann [sic] where Morgan Stanley was

"caught making material misstatements to the Judge" and a class action suit in which

"Robert and Alina Quintana were defrauded out of fair compensation for their claims

against Morgan Stanley."  (RICO Case Stmt. at 88).  Sathianathan makes conclusory

assertions that the mails were used in furtherance of this scheme, but has not cited any

specific mailings which might constitute predicate racketeering acts.  (<u>Id.</u>).[11]

---

[11]     Elsewhere in his RICO Case Statement, Sathianathan also mentions others who
allegedly have been defrauded or extorted by the Defendants.  (<u>See</u> <u>id.</u> at 18-20).  Once again,
however, he has not identified any predicate racketeering acts allegedly related to those schemes.

For these reasons, Sathianathan's FAC fails to satisfy the pattern requirement. In view of this failing, it is not necessary to address whether Sathianathan has adequately pleaded the existence of an "enterprise," which the Defendants allege is another infirmity in Sathianathan's substantive RICO claims.

b.    Section 1962(d)

Turning to Sathianathan's RICO conspiracy claim, the FAC is filled with conclusory assertions regarding the existence of a conspiratorial agreement among Smith Barney, Morgan Stanley, and their respective law firms. (See FAC at 388-95). Such allegations clearly are insufficient, as a matter of law, to meet Sathianathan's pleading burden in this case. Katz v. Morgenthau, 709 F. Supp. 1219, 1230-31 (S.D.N.Y. 1989), rev'd in part on other grounds, 892 F.2d 20 (2d Cir. 1989).

Additionally, as the Second Circuit has noted, where a plaintiff's substantive RICO claims have been dismissed, a RICO conspiracy claim under Section 1962(d) cannot survive a motion to dismiss. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3rd Cir. 1993); accord Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir. 1996), rev'd on other grounds, 525 U.S. 128 (1998). Accordingly, for this reason as well, the Defendants are entitled to the dismissal of Sathianathan's RICO conspiracy claim.

While the RICO conspiracy allegations of the FAC are not a model of clarity, Sathianathan's RICO Case Statement suggests that at least some of the conspiracy he alleges arises out of alleged agreements between his former employers and their

50

lawyers.  (See RICO Case Stmt. at 35).  To that extent, Sathianathan's claims also fail

under the intracorporate conspiracy doctrine because a corporation cannot conspire with

its employees or attorneys.  See Anemone v. MTA, __ F. Supp. 2d __, ___, No. 05 Civ.

3170 (MBM), 2006 WL 164910, at *10 (S.D.N.Y. Jan. 24, 2006) (quoting Nat'l Congress

for Puerto Rican Rights v. City of New York, 75 F. Supp. 2d 154, 168-69 (S.D.N.Y.

1999)) ("[U]nder the intracorporate conspiracy doctrine, '[w]here individual defendants

are all employees of the institutional defendant, a claim of conspiracy will not stand.'");

Nassau County Employee "L" v. County of Nassau, 345 F. Supp. 2d 293, 304 (E.D.N.Y.

2004) (quoting Quinn v. Nassau County Police Dep't, 53 F. Supp. 2d 347, 359 (E.D.N.Y.

1999)) ("Under the intracorporate conspiracy doctrine, officers, agents and employees of

a single corporate entity are legally incapable of conspiring together."); Stoner v. N.Y.C.

Ballet Co., No. 99 Civ. 0196 (BSJ), 2002 WL 523270, at *9 (S.D.N.Y. Apr. 8, 2002)

("[T]here can be no conspiracy between a corporation and its counsel where the advice or

concerted activity was within the scope of the representation."); Jed S. Rakoff & Howard

W. Goldstein, RICO Civil and Criminal Law and Strategy § 106[4], at 1-105 (2005)

(citing Sadighi v. Daghighfekr, 36 F. Supp. 2d 279, 296-98 (D.S.C. 1999)).

       Finally, the only document that Sathianathan has pointed to as evidence of

the alleged conspiracy is an email dated July 23, 2002, that Yellen sent to several other

persons, including Sathianathan.  (See FAC Ex. Set Seven, Tab 4).  According to

Sathianathan, in that email Yellen "admitted [to Sathianathan] that Morgan Stanley had

entered into an agreement with the Smith Barney RICO enterprise involving [him]

without [his] knowledge and after [he] had refused to take part in any of the unlawful

activities of RICO person Smith Barney." (Id. ¶ 1135). In fact, the email simply

responded to an inquiry from the arbitration panel as to whether Morgan Stanley agreed

with Smith Barney's position that its discussions with Sathianathan were subject to a joint

defense agreement among Smith Barney, Morgan Stanley, and Sathianathan. (Id. Ex. Set

Seven, Tab 4). Although the version of Yellen's email attached to the complaint is

incomplete, it does establish Morgan Stanley's concurrence with Smith Barney's

assertion that there was an oral joint defense agreement which rendered such

conversations privileged. (Id.). However, the assertion of a claim of privilege in a

litigation or arbitration – even if misguided – obviously is insufficient to meet

Sathianathan's burden of showing that there is reason to believe that Smith Barney and

Morgan Stanley entered into a conspiracy to engage in a pattern of racketeering activity.

See United States v. Salvagno, 306 F. Supp. 2d 258, 271 (N.D.N.Y. 2004) (quoting

United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir.1989)) ("The joint defense

agreement, or common-interest rule, is an extension of the attorney-client privilege which

'serves to protect the confidentiality of communications passing from one party to the

attorney for another party where a joint defense effort or strategy has been decided upon

and undertaken by the parties and their respective counsel.'"); Lugosch v. Congel, 219

F.R.D. 220, 238 (N.D.N.Y. 2003) ("The essential benefit of [a joint defense agreement] is

that a member of the common legal enterprise cannot reveal the contents of the shared

communications without the consent of all the parties.").

For these reasons, Sathianathan's first three claims for relief must be dismissed.

2.      Civil Rights

In his fourth through sixth causes of action, Sathianathan claims that the Defendants' actions violated his civil rights under 42 U.S.C. §§ 1981, 1985, 1986.

Section 1981 provides, in part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 "thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 224 (2d Cir. 2004). To state a claim under Section 1981, Sathianathan must allege that (a) he is a member of a racial minority, (b) a defendant intended to discriminate against him on the basis of his race, and (c) the discrimination concerned one or more of the activities enumerated in Section 1981, such as the right to make and enforce contracts, sue and be sued, be parties to a lawsuit, or give evidence. See Mian, 7 F.3d at 1087; Zemsky v. City of New York, 821 F.2d 148, 150 (2d Cir. 1987).

Sathianathan also alleges the existence of a conspiracy in violation of 42 U.S.C. § 1985. The relevant portion of that statute is Section 1985(3), which provides that "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws," the person

injured may recover damages.  To state a claim under that statute, a plaintiff must plead "[a] a conspiracy; [b] for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; [and] [c] an act in furtherance of the conspiracy; [d] whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States."  Mian, 7 F.3d at 1087 (citing United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 828-29 (1983)).

Finally, Section 1986 provides a damages remedy in circumstances where a person has knowledge of a proposed conspiracy in violation of Section 1985 and the ability to prevent its commission, but fails to do so.  Id. at 1088.  Accordingly, "without a violation of Section 1985, there can be no violation of Section 1986." Koch v. Mirza, 869 F. Supp. 1031, 1039 (W.D.N.Y. 1994); accord Baptiste v. N.Y.C. Transit Auth., No. 02 Civ. 6377 (NRB), 2004 WL 626198, at *7 (S.D.N.Y. Mar. 29, 2004).  The statute contains its own statute of limitations which provides that any suit must be commenced within one year after the cause of action has accrued.  42 U.S.C. § 1986.

As the Supreme Court noted in Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 511 (2002), the Federal Rules of Civil Procedure require only notice pleading. Accordingly, at least in the area of employment discrimination, it is not necessary that a complaint allege facts constituting a prima facie case in order to survive a motion to dismiss.  Id. at 510.  Nonetheless, there must be some showing of the factual grounds upon which a claim rests.  Id. at 512 (citing Conley v. Gibson, 355 U.S. 41, 47 (1957)).

To prevail on his claims under either Section 1981 or Section 1985, Sathianathan consequently must "allege <u>facts</u> from which discriminatory intent can be inferred." <u>Hill v. Philip Morris USA</u>, No. 03 Civ. 6922 (GEL), 2004 WL 1065548, at *4 (S.D.N.Y. May 11, 2004) (emphasis added). A showing of racial bias alone is not sufficient; rather, a plaintiff must show purposeful discrimination. <u>Id.</u> (collecting cases); <u>see also</u> <u>Koch v. Yunich</u>, 533 F.2d 80, 85 (2d Cir. 1976) ("Complaints relying on the civil rights statutes are plainly insufficient unless they contain some specific allegations of fact indicating a deprivation of civil rights, rather than state simple conclusions.").

The FAC falls woefully short of the mark. For example, Sathianathan's Section 1981 cause of action is filled with such conclusory assertions as:

- "If I had been white, I would not have been treated the same way by Smith Barney." (FAC ¶ 1201).

- "If I had been white, Smith Barney would have offered and, therefore, entered into a contract with me in order to compensate me for the damage that Smith Barney had inflicted on the customer." (<u>Id.</u> ¶ 1233).

- "Because of my Indian race/Indian ethnicity (i.e., the fact that I am not white), the defendants prejudicially disregarded their obligations pursuant to their contracts with me with wanton and reckless disregard for their obligations to me, my rights, my career and my life." (<u>Id.</u> ¶ 1238).

- The fact that Smith Barney and Keesal, Young & Logan have a racial animus against me and other non-whites (or other persons of the Indian race) is shown by their actions in making a race-based defense against me and because of comments and other actions they have made against me. (<u>Id.</u> ¶ 1277).

55

However, the relatively few facts that Sathianathan relies upon to support these conclusory assertions do not evidence any intent to discriminate against him because he is Indian. The mere fact that the Defendants may have treated Sathianathan shabbily or improperly, as he alleges, is not be enough to satisfy his burden of showing <u>facts</u> which give rise to an inference of purposeful discrimination.

In an effort to meet his pleading burden, Sathianathan also alleges, at considerable length, that many of the institutional defendants in this case are largely, if not entirely, white in composition, and therefore biased against him. (<u>See, e.g.</u>, <u>id.</u> at ¶¶ 1205 ("The partnerships of most of these outside law firms used by Smith Barney are virtually all white."), 1214 ("Smith Barney's and Morgan Stanley's race-based animus against me and other non-whites (or against persons of the Indian race) is shown by the fact that it is these same senior executives who, by their unlawful hiring practices, have created virtually all-white Litigation Units of the Smith Barney Legal Department and the Morgan Stanley Legal Department . . . ."), 1256 ("Based on some of his comments during the Arbitration, it appears that Keesal, Young & Logan founder (and lead selector of his other partners) Samuel 'Skip' Keesal seems to believe that non-whites come from the streets (or some other similar place)," 1257 ("The fact that the 'New Hampshire lily-white' Smith Barney Legal Department has a long history of more than twenty years of intimately working with the racially prejudiced all-white partnership of Keesal, Young & Logan is indicative of the fact that the Smith Barney Legal Department also shares the racial prejudices of Keesal, Young & Logan against Indians and other non-whites.")).

There is, of course, some reason to doubt whether all of these organizations are biased against non-whites in general, and Indians in particular, since the undisputed facts show that Smith Barney and Morgan Stanley, through their counsel, paid Venkatramani, who is himself an Indian, $5.7 million to settle his claims. Moreover, as part of its settlement, Morgan Stanley secured a release from further liability for Sathianathan. Nevertheless, even if one were to assume that the Defendants collectively harbored a bias against non-whites, that would not be sufficient to make out a claim under Sections 1981 and 1985. See Hill, 2004 WL 1065548, at *4. Instead, Sathianathan must allege facts from which the Defendants' discriminatory intent against him can be inferred. Here, despite the extraordinary prolixity of the FAC, Sathianathan's causes of action under Section 1981 and 1985 utterly fail to meet this requirement.

Finally, because Sathianathan has failed to allege facts sufficient to support a claim that the Defendants conspired to violate his civil rights under Section 1985(3), he also cannot recover any damages under Section 1986 on the theory that one or more of the Defendants failed to prevent the conspirators from causing him harm. Similarly, in the absence of a violation of Sections 1981, 1985, or 1986, Sathianathan is not entitled to recover any fees or expenses. Sathianathan's sixth and seventh causes of action consequently must also be dismissed.

E.      State Law Claims[12]

_____

[12]      Sathianathan's eighth cause of action alleges legal malpractice. Although he
(continued...)

1.     Civil Conspiracy

In his ninth cause of action, Sathianathan alleges that all of the Defendants engaged in a conspiracy against him.  (See FAC ¶¶ 1564-1637).  Without some showing of an underlying tort, however, Sathianathan cannot recover damages on a separate cause of action for conspiracy.  See, e.g., Qwest Commc'ns Corp. v. Weisz, 278 F. Supp. 2d 1188, 1192 (S.D. Cal. 2003) ("conspiracy is a theory of liability rather than an independent tort"); Chabra v. S. Monterey County Mem'l Hosp., Inc., No. 94 Civ. 20335 (EAI), 1994 WL 564566, at *8 (N.D. Cal. Oct. 3, 1994) ("Conspiracy is not a cause of action . . . . Therefore, it is the acts done and not the conspiracy to do them which should be regarded as the essence of the civil action.") (internal citation and quotations omitted); Eli Lilly and Co. v. Roussel Corp., 23 F. Supp. 2d 460, 497 (D.N.J. 1998) ("Plaintiff cannot bring an action alleging civil conspiracy unless defendants committed an act which would be actionable even without the conspiracy."); Tynan, L.T. v. Gen. Motors Corp., 248 N.J. Super. 654, 668 (N.J. App. Div. 1991), rev'd in part on other grounds, 127 N.J. 269 (1992) ("a conspiracy is not actionable absent an independent wrong"); Win Spark Trading Co. v. Century Bus. Credit Corp., Nos. 01 Civ. 6603, 6605, 6607 (JSR), 2002 WL 1343763, at *1 n.1 (S.D.N.Y. June 18, 2002) (civil conspiracy is not an

---

[12](...continued)
mentions both the Bressler firm and KYL in that cause of action, (see FAC ¶¶ 1542-60), only the Bressler firm ever served as his counsel.  Accordingly, because Sathianathan's legal malpractice claims against the Bressler firm are clearly precluded by the doctrines of res judicata and collateral estoppel, I have not considered the legal sufficiency of those claims.

independent cause of action under New York law); <u>Sokol v. Addison</u>, 742 N.Y.S.2d 311, 312 (2d Dep't 2002) ("New York does not recognize civil conspiracy to commit a tort as an independent cause of action."); <u>Hoag v. Chancellor, Inc.</u>, 677 N.Y.S.2d 531, 535 (1st Dep't 1998) (allegations of conspiracy are permissible only when they "connect a defendant to an otherwise actionable tort").

Accordingly, Sathianathan's ninth cause of action should be dismissed.

### 2.     Implied Covenant of Good Faith and Fair Dealing

In his tenth cause of action, Sathianathan apparently alleges that the Smith Barney Defendants breached their implied covenant of good faith and fair dealing in connection with the "arbitration of [his] claims . . . at [the] March 2004 Pacific Exchange arbitration."  (FAC ¶ 1639).  For such an implied covenant to exist, there must first be a valid contract between Smith Barney and Sathianathan.  <u>See, e.g.</u>, <u>Smith v. City and County of San Francisco</u>, 225 Cal. App. 3d 38, 40 (Cal. App. 1st Dist. 1990) ("The prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract."); <u>Pepe v. Rival Co.</u>, 85 F. Supp. 2d 349, 390 (D.N.J. 1999) (Under New Jersey law, "[t]he doctrine of good faith and fair dealing cannot . . . create rights or obligations in the absence of a valid contract."); <u>Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.</u>, No. 03 Civ. 1537 (MBM), 2003 WL

23018888, at *5 (S.D.N.Y. Dec. 22, 2003) (quoting Am.-European Art. Assoc., Inc. v. Trend Galleries, Inc., 641 N.Y.S.2d 835, 836 (1st Dep't 1996)) ("there can be no breach of the duty of good faith and fair dealing when there is no 'valid and binding contract from which such a duty would arise'").

Although the FAC incorporates by reference into Sathianathan's tenth cause of action all of the allegations that Sathianathan makes in the preceding 547 pages, he has failed to cite any specific contract that allegedly gave rise to Smith Barney's alleged implied covenant of good faith and fair dealing. The closest that he comes is to allege in his tenth cause of action that "from around July 1999 until April 2004," more than three years after his move to Morgan Stanley, he remained a Smith Barney "client." (FAC ¶ 1640). Based on this alleged relationship, Sathianathan claims that the Smith Barney Defendants' breached their "duty and contract of good faith and fair dealing with [him]" by procuring the Award by "fraudulent, corrupt and undue means." (Id. ¶ 1641).

Assuming that Sathianathan was a Smith Barney customer throughout the period that he alleges, to prevail on his tenth cause of action, Sathianathan would have to establish that the Smith Barney Defendants frustrated his ability to receive the benefits of his customer agreement. See Guz v. Bechtel Nat'l, Inc., 24 Cal 4th 317, 321 (2000) ("the employment relationship is fundamentally contractual, and the implied covenant of good faith and fair dealing cannot supply limitations on termination rights to which the parties have not actually agreed"); Sheth v. New York Life Ins. Co., 709 N.Y.S.2d 74, 75 (1st Dep't 2000) (The implied covenant of good faith and fair dealing "may not be used as a

60

substitute for a nonviable claim of breach of contract.").  The implied covenant cannot impose duties or limits on the contracting parties which are inconsistent with that contract.  Guz, 24 Cal. 4th at 349-50; Morrison v. Am. Int'l Ins. Co. of Am., 381 N.J. Super. 532, 544 (N.J. App. Div. 2005) (conduct allegedly undertaken in bad faith must deny plaintiff "the benefit of the bargain originally intended by the parties.").

Here, there is no suggestion in the FAC that Smith Barney did anything to violate or frustrate Sathianathan's own customer agreement with Smith Barney.  Nor is there any indication that Smith Barney had any other express contract with Sathianathan.  For these reasons, Sathianathan's tenth cause of action for breach of the implied covenant of good faith and fair dealing must be dismissed.

3.    Failure to Supervise

In his eleventh cause of action, Sathianathan alleges that Turan, Sullivan and Restaino failed to supervise their subordinate in-house attorneys at Smith Barney and Morgan Stanley, who, in turn, committed certain "fraudulent acts" during the arbitration of the Sathianathan Claim in 2004.  (See FAC ¶¶ 1656-48).  Sathianathan characterizes this failure to supervise as a tort claim.  (Id. ¶ 1648).[13]

The assumption on which Sathianathan's failure to supervise claim necessarily proceeds is that subordinate Smith Barney and Morgan Stanley in-house

---

[13]    Sathianathan brought a similar failure to supervise claim against the Bressler firm in the New Jersey state court action.  (See Manning Aff. Ex. A ¶ 167).  That claim, of course, has been dismissed.

counsel engaged in tortious conduct with respect to him.  Apart from his conclusory averments, however, Sathianathan has not alleged any specific acts which could give rise to tort liability on the part of those attorneys, much less their superiors.  In the absence of any <u>facts</u> from which an inference of misconduct could be drawn, Sathianathan's failure to supervise claim – which sounds in negligence – must be dismissed for failure to state a claim.

### 4.  Punitive Damages

Sathianathan's twelfth cause of action seeks the recovery of punitive damages.  (<u>See</u> FAC ¶¶ 1650-52).  The law is clear, however, that a plaintiff may not assert a separate cause of action for punitive damages.  <u>See, e.g.</u>, <u>Paisley v. Coin Device Corp.</u>, 5 A.D. 3d 748, 750 (2d Dep't 2004) ("We note that no separate cause of action for punitive damages lies for pleading purposes."); <u>Shapira v. Charles Schwab & Co., Inc.</u>, 187 F. Supp. 2d 188, 192 (S.D.N.Y. 2002) ("[I]t is hornbook law that there is no stand-alone claim in New York for punitive damages."); <u>Klesh v. Coddington</u>, 295 N.J. Super. 51, 65 (Super. Ct. 1996) ("[P]unitive damages cannot stand alone, separate and apart from any other cause of action."); <u>Hilliard v. A.H. Robins Co.</u>, 148 Cal. App. 3d 374, 391 (Cal. App. 2d Dist. 1983) ("There is no cause of action for punitive damages.").

Accordingly, this claim too must be dismissed.

### F.  Motion to Amend

Sathianathan has filed two motions to amend the FAC pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.  In the first of these motions, submitted at

the time that he served his papers in opposition to Smith Barney's motion to dismiss, Sathianathan indicates that he wishes to add several predicate acts to his RICO causes of action. (See Docket No. 49 at 4). More specifically, Sathianathan claims that the KYL and Smith Barney Defendants used the mails and interstate wires to make material misrepresentations to the district judge in the Northern District of California who confirmed the Award and denied his motion for its vacatur. (See id.). Among these alleged misrepresentations was an assertion that he had signed an Arbitration Disclosure Waiver Form. (Id.). Sathianathan also contends that Morgan Stanley used the mails and interstate wires fraudulently in 2005 to avoid the disclosure of an email between DiModica and another Morgan Stanley employee, as to which Morgan Stanley improperly sought to invoke its attorney-client privilege. (Id. at 5). Other purposes for which Sathianathan filed his first motion to amend were to (1) include the NASD in the RICO enterprises alleged in the FAC; (2) plead fraud and the RICO predicate acts with particularity (if he had not previously done so); (3) allege additional facts relevant to Morgan Stanley because the FAC was more focused on Smith Barney; (4) add claims against Morgan Stanley that he was unable to bring in the Pacific Exchange arbitration; and (5) make the FAC "shorter." (Docket No. 65 at 2, 15). Almost as an aside, Sathianathan notes in his reply brief that it is also "conceivable" that he may want to add a claim against the Bressler firm under 42 U.S.C. § 1983 for conspiring with the judge in the New Jersey state court action because the Judge has "admitted" to engaging in "discrimination" against him. (Id. at 6).

In his second "ex parte" motion to amend, Sathianathan seeks to add as defendants the reporting service and court reporters who transcribed the Pacific Exchange arbitration proceedings. (Docket No. 94).

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its complaint after a responsive pleading has been served "only by leave of the court" or upon written consent. Fed. R. Civ. P. 15(a). Whether to grant such a motion is a matter that lies within the sound discretion of the district court. See Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971). Although leave to amend ordinarily is "freely given," Fed. R. Civ. P. 15(a), the Court may exercise its discretion to deny the motion where there is evidence of undue delay, bad faith, undue prejudice to the opposing party, or futility. Foman v. Davis, 371 U.S. 178, 182 (1962).

Rule 7(b) of the Federal Rules of Civil Procedure requires that motions "state with particularity the grounds therefor, and . . . set forth the relief or order sought." Fed. R. Civ. Proc. 7(b). In keeping with this precept, judges in this District typically have required that a plaintiff making a Rule 15(a) motion append "a complete copy of the proposed amended complaint [to the] . . . motion so that both the Court and opposing parties can understand the exact changes sought." Smith v. Planas, 151 F.R.D. 547, 550 (S.D.N.Y. 1993). Here, because Sathianathan has failed to comply with this requirement, the Court is forced to assess the viability of his proposed amendments on the basis of his motion papers alone.

The first change proposed by Sathianathan is the addition of a predicate act relating to the KYL Defendants' submission of a statement to the judge in the Northern District of California indicating that Sathianathan had signed a form waiving arbitrator disclosure. In the FAC, Sathianathan has annexed as an exhibit the Pacific Exchange rules relating to the disclosure of potential conflicts on the part of arbitrators. (See FAC Ex. Set Five, Large Tab 4, Small Tabs 10, 11). He also has annexed a series of emails which make clear that the Pacific Exchange acknowledged the "continuing duty" of its arbitrators to "disclose any interests, relationships, or circumstances . . . that might preclude rendering an objective and impartial determination." (Id. Ex. Set Seven, Tab 7 at 1). In the course of confirming the Award, the district judge in the Northern District of California observed that Sathianathan did not challenge any of the panel members. (See Moving Defs.' Suppl. P. & A., Ex. A at 2). Assuming, arguendo, that KYL intentionally misrepresented to that judge that Sathianathan had waived the disclosure of any arbitrator conflicts, Sathianathan still has not alleged any facts which would suggest that this misrepresentation was material, nor is there any reason to believe that it was. Accordingly, the misstatement relied upon cannot possibly give rise to a predicate act of mail or wire fraud. See Neder v. United States, 527 U.S. 1, 21-23 (1999). Additionally, to state a RICO claim, Sathianathan must show that he relied on the misrepresentation or failure to disclose. See Bank of China, 359 F.3d at 177-78. Sathianathan cannot meet this requirement since he obviously knew what he had or had not signed.

It similarly is apparent from the face of Sathianathan's motion papers that he could not have relied on Morgan Stanley's alleged false statements in 2005 concerning the privileged nature of the email communication between DiModica and another Morgan Stanley employee since he concedes that he had received a copy of that email in 2003 before any claim of privilege was made.  (See Docket No. 49 at 5).

Sathianathan also indicates in his first motion that he wishes to plead both fraud and his RICO predicate acts with greater particularity.  However, additional detail still would not cure Sathianathan's failure to establish the requisite continuity, which remains a defect fatal to his RICO claims.

Sathianathan also suggests that he might seek to amend the FAC to allege that the Bressler firm conspired with Judge Winard, noting that the judge has admitted to "discrimination."  (Docket No. 65 at 6).  What Judge Winard in fact said in his oral decision is that the case law obliged him to "review the complaint with a high degree of circumspection and discrimination" and to view the facts in the light most favorable to Sathianathan.  (Manning Aff. Ex. C at 59).  Sathianathan's effort to take this quote out of context and suggest that it provides the basis for a claim under Section 1983 speaks volumes about the real purpose for which he seeks to amend the FAC.  In any event, even if Sathianathan were proceeding in good faith, any possible claim that Sathianathan might seek to assert against the Smith Barney Defendants arising out of the facts of this case is barred, as noted above, by the doctrines of res judicata and collateral estoppel.

66

The motivation behind Sathianathan's proposed amended complaint is perhaps best demonstrated by his proposal to name the NASD as a participant in the RICO enterprise. Suffice it to say, if the NASD participated in a RICO enterprise, Sathianathan had ample opportunity to say so in his FAC, which was filed <u>after</u> the NASD issued its decision. Moreover, Sathianathan has not explained in his motion papers exactly what actions on the part of the NASD allegedly would give rise to its RICO liability. Sathianathan similarly has not set forth the additional facts he would allege with respect to Morgan Stanley.

The Defendants clearly should not have to endure another round of briefing after Sathianathan amends his complaint to include additional allegations which – despite ample opportunity therefor – have yet to be detailed. In his first motion to amend, Sathianathan urges the Court to give him the benefit of the doubt and grant him leave to amend on the basis of the improvement in his ability to articulate his case evidenced by his more recent briefs. (Docket No. 65 at 4). Having read his papers carefully, however, I fail to see any such improvement. What I see, instead, is a litigant who will not face the reality that there no longer is a good faith basis for his continuing efforts to recover damages from the Defendants. For these reasons, the first motion to amend should be denied.

Turning to the second motion to amend, Sathianathan seeks to bring unspecified claims against the reporting service and court reporters who transcribed the Pacific Exchange arbitration. (Docket No. 94). He also filed the same motion in the

Northern District of California after that action was dismissed with prejudice. (See

Docket No. 89 (Moving Defs.' Request for Judicial Notice dated Nov. 14, 2005) Ex. H).

Even if this Court were to indulge in the assumption that Sathianathan could concoct a

facially-valid claim against those defendants, and that it was not abusive to file the same

motion in two jurisdictions, Sathianathan has not shown that there would be any basis for

this Court to assert personal jurisdiction over them since his own exhibits show that they

do business in the "714" area code – i.e., California – and there is no indication that they

have any presence, or have ever transacted any business in New York. (See FAC Ex. Set

Five, Large Tab 4, Small Tab 12 & Large Tab 5).

   Accordingly, Sathianathan's second motion for leave to amend should also

be denied.

  G. Motion to Strike

   The Bressler Defendants have moved to strike Sathianathan's FAC.

Subsequently, however, they filed a motion to dismiss that pleading. Since I have

recommended that the latter motion be granted, there is no need to consider the motion to

strike, which should be denied as moot.

  H. Motion for Vexatious Litigant Determination

   The Smith Barney Defendants, joined by the Bressler Defendants, have

moved, pursuant to Rule 11 of the Federal Rules of Civil Procedure and the inherent

authority of this Court, to have Sathianathan deemed a vexatious litigant, and to have him

enjoined from filing any further litigation related to the Venkatramani or Sathianathan

Claims.  (See Docket Nos. 68-70).  In addition to opposing these motions, Sathianathan has filed a cross-motion seeking sanctions against the Defendants under Rule 11 for filing what he believes are frivolous motions.  (See Docket Nos. 71-73).

Rule 11 makes it sanctionable for litigants knowingly to file frivolous papers designed to harass other parties or create unnecessary delay or cost in a matter. See Fed. R. Civ. P. 11.  As the Second Circuit indicated in Safir v. United States Lines, Inc., 792 F.2d 19, 23-24 (2d Cir. 1986), a district court possesses the authority, in appropriate circumstances, to enjoin a person from filing further vexatious litigation. Indeed, a "district court not only may but should protect its ability to carry out its constitutional functions against the threat of onerous, multiplicitous, and baseless litigation."  Id. at 24 (internal citation and quotations omitted); see also In re Martin-Trigona, 737 F.2d 1254, 1262 (2d Cir. 1984).  This authority extends to pro se litigants. Yosef v. Passamaquoddy Tribe, 876 F.2d 283, 287 (2d Cir. 1989); McDonald v. Head Criminal Court Supervisor Officer, 850 F.2d 121, 124 (2d Cir. 1988); Fariello v. Campbell, 860 F. Supp. 54, 71 (E.D.N.Y. 1994).

In issuing an injunction against a vexatious litigant, "the traditional standards for injunctive relief, i.e., irreparable injury and inadequate remedy at law, do not apply."  In re Martin-Trigona, 737 F.2d at 1262.  Instead, a "history of litigation entailing vexation, harassment and needless expense to [other parties] and an unnecessary burden on the courts and their supporting personnel is enough."  Id. (internal citation and

quotations omitted).  There are five factors that a district court should consider in

determining whether to restrict a litigant's future access to the courts:

> (1) the litigant's history of litigation and in particular whether
> it entailed vexatious, harassing or duplicative lawsuits; (2) the
> litigant's motive in pursuing the litigation, e.g., does the
> litigant have an objective good faith expectation of
> prevailing ?; (3) whether the litigant is represented by
> counsel; (4) whether the litigant has caused needless expense
> to other parties or has posed an unnecessary burden on the
> courts and their personnel; and (5) whether other sanctions
> would be adequate to protect the courts and other parties.

Safir, 792 F.2d at 24.  "Ultimately, the question the court must answer is whether a

litigant who has a history of vexatious litigation is likely to continue to abuse the judicial

process and harass other parties."  Id.

    1.   Litigation History

       It is clear that Sathianathan has filed numerous duplicative proceedings and

motions.  Indeed, many of his claims in this lawsuit replicate those that he advanced in

the Sathianathan Claim before the Pacific Exchange and in his Northern District of

California suit.  He similarly has sought to add the reporters who transcribed the

arbitration as defendants in both this action and the Northern District of California

lawsuit.  In fact, his motion to add the reporters to that action was filed after it was

dismissed.  Sathianathan also seeks to add the NASD as a party to this action even though

he apparently also intends to file a separate lawsuit against the NASD.  Given this lengthy

history of litigation, there is no reason to believe that Sathianathan will end what he

obviously considers a crusade unless he is required to do so.

### 2. Sathianathan's Motivation

Even if Sathianathan began his quest with a good faith expectation of prevailing, the objective truth is that no forum that has reached the merits of his claims has ruled in his favor. Nonetheless, like the vexatious litigant in <u>Safir</u>, Sathianathan "has repeatedly asserted the same claims in slightly altered guise." <u>Id.</u> Indeed, Sathianathan has admitted to filing certain actions in order to "toll" his claims during the pendency of other actions or as "back-up" in the event that those suits failed. At this stage, Sathianathan would be hard-pressed to point to his objective good-faith belief in prevailing in any of the remaining actions.

### 3. Pro Se Status

The third <u>Safir</u> factor arguably tips in Sathianathan's favor because he is proceeding <u>pro se</u>. However, the Second Circuit has noted that the "special solicitude [that a <u>pro se</u> plaintiff] must face does not extend to the wilful, obstinate refusal to play by the basic rules of the system upon whose very power the plaintiff is calling to vindicate his rights." <u>McDonald</u>, 850 F.2d at 124 (internal citation and quotations omitted). Here, in his various lawsuits, Sathianathan has blithely ignored the reality that he is no longer permitted to work as a stockbroker, not because of anything that Smith Barney or Morgan Stanley did to him, but because the NASD found that <u>he</u> had engaged in serious misconduct which he refused to acknowledge.

### 4. Burden and Expense

Turning to the fourth Safir factor, it is clear from the volume of paper produced by both sides that the Defendants have incurred tremendous expense in the course of responding to Sathianathan's many complaints and motions. For example, in the Northern District of California action alone, several rounds of briefing were required before his case eventually was dismissed. Other proceedings as well have generated lengthy records, including "2,800 pages of documents" in the Pacific Exchange arbitration. (Muntz Decl., Ex. D at 8).

5.     Availability of Other Sanctions

As for the final Safir factor, this Court is mindful that "barring a litigant from the courthouse is a serious matter, 'for access to the Courts is one of the cherished freedoms of our system of government.'" Raffe, 619 F. Supp. at 898 (quoting Kane v. City of New York, 468 F. Supp. 586, 590 (S.D.N.Y. 1979), aff'd, 614 F.2d 1288 (2d Cir. 1979)). Sathianathan has admitted, however, that he intends to file at least one more suit against the NASD in an effort to vindicate his views regarding the corruptness of the securities industry by which he formerly was employed. He also apparently has not given up on the notion of bringing further claims against the Bressler firm and the KYL Defendants. (See Docket No. 65 at 6; RJN II, Ex. I). Therefore, short of an injunction, there does not seem to be any way to dissuade Sathianathan from continuing his crusade. In fact, the adverse determinations in prior proceedings seem only to fuel his fire.

Accordingly, the Defendants' requests for an injunction should be granted, but its scope should be narrowly tailored to suit the facts of this case. Specifically, I recommend that:

(1) Sathianathan be permanently enjoined and restrained from filing or serving any new action or proceeding in any federal court or tribunal against any of the Defendants named in this action, or their officers, agents, or employees, or the NASD, arising out of, or which relates to, the Venkatramani or Sathianathan Claims or any of the prior proceedings between or among, Sathianathan, the Smith Barney Defendants, the Morgan Stanley Defendants, the Bressler Defendants, or the KYL Defendants, and (except as noted below) from proceeding further in any manner whatsoever with the prosecution of this action;

(2) Sathianathan be permanently enjoined and restrained from commencing any further action or proceeding in any state court against any of the Defendants named in this action, or their officers, agents, or employees, or the NASD, arising out of or which relates to the Venkatramani or Sathianathan Claims or any of the prior proceedings between or among, Sathianathan, the Smith Barney Defendants, the Morgan Stanley Defendants, the Bressler Defendants, or the KYL Defendants, unless he has first complied with the procedures outlined in Martin-Trigona, 737 F.2d at 1258 n.3, for obtaining leave from said court; and

(3) nothing in this Report and Recommendation or any order of this Court shall be construed as denying Sathianathan the right to file objections to this Report and Recommendation or to seek direct review of any decisions or orders rendered in this or any previously-filed action or proceeding, or to file papers responding to any papers filed or applications made by any adverse party in this or any previously-filed action or proceeding, or to bring complaints pursuant to 28 U.S.C. § 372(c).

If the foregoing recommendation is adopted, Sathianathan's cross-motion for sanctions for the filing of a "frivolous" motion for vexatious litigator determination (Docket No. 73) obviously should be denied as moot. Even if the Court declines to issue an injunction, Sathianathan's cross-motion still should be denied because he has failed to comply with the mandatory safe harbor provisions of Rule 11 of the Federal Rules of Civil Procedure.[14] See Hadges v. Yonkers Racing Corp., 48 F.3d 1320, 1327-28 (2d Cir. 1995) ("[T]he 1993 amendment [to Rule 11] establishes a 'safe harbor' of 21 days during which factual or legal contentions may be withdrawn appropriately corrected in order to avoid sanction."); In re Global Crossing, Ltd. Sec. Litig., 221 F.R.D. 394, 396 (S.D.N.Y. Dec. 4, 2003) (Rule 11(c)(1)(A) "permits a party to escape sanctions by withdrawing an otherwise sanctionable filing within 21 days after being put on notice by the opposing party that sanctions will be sought"); Lozano v. Peace, No. 05 Civ. 0174 (SJF)(ETB), 2005 WL 1629644, at *2 (E.D.N.Y. Jul. 11, 2005) ("Because plaintiff has failed to comply with Rule 11's safe harbor provision by prematurely filing the sanctions motion within 21 days of serving the motion upon defendant, the motion for sanctions should be rejected.").

---

[14] In December 2005, Sathianathan also moved for criminal sanctions against all of the Defendants and their counsel based upon the false statements that they allegedly made in connection with his lawsuit in the Northern District of California. (See Docket No. 97). I denied this non-dispositive motion by memorandum endorsement on January 5, 2006, explaining that (a) a civil litigant lacks standing to compel the imposition of criminal sanctions, (b) Sathianathan failed to show that he complied with the safe harbor provisions of Rule 11, and (c) the conduct complained of occurred before a different judge in another district. (Id.).

V.    Conclusion

For the foregoing reasons, the Defendants' motions to dismiss (Docket Nos. 23 & 53) should be granted, Sathianathan's motions to amend (Docket Nos. 48-49 & 94) should be denied, Bressler's motion to strike the FAC (Docket No. 5) should be denied as moot, the Defendants' motions to declare Sathianathan a vexatious litigant (Docket No. 68) should be granted in part, and Sathianathan's motion for sanctions (Docket No. 73) should be denied.

VI.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the clerk of the Court, and send copies to the chambers of the Honorable Deborah A. Batts, United States District Judge, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Batts.  The failure to file timely objections will result in a waiver of those

objections for purposes of appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:     New York, New York
           February 24, 2006

                                          FRANK MAAS
                                          United States Magistrate Judge

Copies to:

Honorable Deborah A. Batts
United States District Judge

Raghavan Sathianathan [Pro Se]
c/o S. T. Allen & Co.
336 Bloomfield Avenue
Montclair, New Jersey 07042

Diana C. Manning, Esq./ Mark Talmadge, Esq.
Bressler, Amery & Ross
17 State Street
New York, New York 10004

Timothy DiDomenico, Esq.
Greenberg Traurig LLP
MetLife Building
200 Park Avenue
New York, New York 10166

David N. Kittredge, Esq./ Jonathan C. Thau, Esq.
Luboja & Thau LLP
10 East 40th Street, 30th Floor
New York, New York 10016

Samuel A. Keesal, Esq./ Sean D. Muntz, Esq.
Keesal, Young & Logan
400 Oceangate, P.O. Box 1730
Long Beach, California 90801